**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:21-cv-3099 |
| Plaintiff, | |
| vs. | |
| DAVID VETTEL, | |
| Defendant. | |

**CLOSING ARGUMENT BRIEF OF DAVID VETTEL**

**PREPARED AND SUBMITTED BY**

Ryan P. Watson, #25597
John Andrew McWilliams, #25798
GROSS WELCH MARKS CLARE, P.C., L.L.O.
1500 Omaha Tower
2120 South 72nd Street
Omaha, Nebraska 68124
(402) 392-1500
rwatson@gwmclaw.com
jmcwilliams@gwmclaw.com
*Attorneys for Defendant David Vettel*

## INTRODUCTION

The United States initiated this action to collect outstanding civil penalties from David Vettel arising from his failure to file Reports of Foreign Bank and Financial Accounts ("FBARs") for tax years 2006 to 2011. (Doc. #1, p. 1, ¶ 1).

At trial on January 23, 2024, the single issue remaining for this Court was whether David's failure to file FBARs was "willful." (Doc. #54, p. 16). If found to be a willful violation, the FBAR penalties, interest, late-payment penalties, and associated fees against David totaled $737,314.30 as of September 1, 2023. (Doc. #54, p. 15, ¶ 118).

The United States has not met its burden of proof that David acted willfully. To establish a willful violation, the United States has the burden of proof to show, by a preponderance of the evidence, that David acted knowingly, that David acted with willful blindness, or that David acted recklessly. Although courts in other jurisdictions have inconsistently defined and applied these standards, David's conduct here does not rise to the level of *willful* conduct.

## THE BANK SECRECY ACT

As explained in the recent case of *United States v. Kelly*, "[t]he Bank Secrecy Act allows the Treasury Secretary to require American citizens to file reports of accounts abroad[.]" 92 F.4th 598, 601–02 (6th Cir. 2024) (citing 31 U.S.C. § 5314(a) & (b)(1)). A citizen with a foreign financial account exceeding $10,000 must file an FBAR to report such account. 31 C.F.R. § 1010.306(c).

Failure to file an FBAR can result in civil penalties. *Kelly*, 92 F.4th at 602 (quoting 31 U.S.C. § 5321(a)(5)(A)). For a non-willful failure to file an FBAR, the civil penalty "shall not exceed $10,000." 31 U.S.C. § 5321(a)(5)(B)(i). For a willful failure to file an FBAR, the taxpayer is subject to "a maximum penalty of either $100,000 or 50% of 'the balance in

the account at the time of the violation'—whichever is greater." *Bittner v. United States*, 598 U.S. 85, 94 (2023) (citing 31 U.S.C. § 5321(a)(5)(C)–(D)). In other words, and as summarized in *Kelly*: "If the failure to file was accidental, the government can assess a penalty of up to $10,000. If, however, the failure to file was willful, the civil penalty grows exponentially." 92 F.4th at 600.

## LEGAL STANDARD & BURDEN OF PROOF

Under 31 U.S.C. § 5321(b)(1), the Secretary of the Treasury "may commence a civil action to recover a civil penalty assessed" for record and reporting violations, including violations of 31 U.S.C. § 5314. In such a civil action, the trial court reviews *de novo* the United States' determination of whether the taxpayer acted willfully. *United States v. DeMauro*, 483 F. Supp. 3d 68, 79 (D.N.H. 2020) (citing *Bedrosian v. United States* (*Bedrosian I*), No. 2:15-cv-05853, 2017 WL 4946433, at *2 (E.D. Pa. Sept. 20, 2017) (unpublished opinion), *rev'd on other grounds*, 912 F.3d 144, 152 (3d Cir. 2018), and *United States v. Williams* (*Williams I*), No. 1:09-cv-00437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010) (unpublished opinion), *rev'd on other grounds*, 489 F. App'x 655, 660 (4th Cir. 2012)).

Under this *de novo* review, the trial court's decision is "based on the merits of the case and not on any record developed at the administrative level." *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012) (quoting *Williams I*, 2010 WL 3473311, at *1). Furthermore, the United States bears the burden to prove, by a preponderance of the evidence, that the taxpayer acted willfully. *McBride*, 908 F. Supp. 2d at 1201 (citing *Williams I*, 2010 WL 3473311, at *1).

## STIPULATED FACTS & EVIDENCE ADDUCED AT TRIAL

### I.    David's ascension within Grain Systems Incorporated

David is a United States citizen with a high-school education. (Doc. #54, p. 1, ¶ 1; Tr. at 69:21–69:22). David initially worked as a draftsman, but with his ambitions to enter the sales arena, he got an opportunity to start his sales career at Chief Industries. (Tr. at 69:25–70:15). Although David had technical knowledge of the grain bin industry, his primary skill in sales was his ability to work with people. (Tr. at 75:2–75:11). His work of recruiting grain bin dealers, performing market research, and generating leads all fundamentally involved relationship building. (Tr. at 75:12–75:15).

Starting in 1993, David worked for Grain Systems Incorporated ("GSI"). (Doc. #54, p. 2, ¶ 5). At GSI, David eventually became the president for international activity in GSI's grain division. (Doc. #54, p. 2, ¶ 6; Tr. at 7:21–7:23, 77:17–77:19). In this capacity, David relied on the corporate accounting department at GSI to calculate particular facts and figures relating to grain bin sales. (Tr. at 78:10–79:3). David had no duties involving payroll taxes or corporate taxes at GSI. (Tr. at 79:4–79:9).

David worked with Sam Moualla at GSI. (Doc. #54, p. 3, ¶ 18). They started working at GSI together in about 1993, and Sam eventually became GSI's regional manager of Eastern Europe, working under David. (Doc. #54, p. 3, ¶ 17; Tr. at 11:1–11:15). David was a part of Sam's wedding in Syria, and Sam participated in David's mother's funeral. (Tr. at 76:13–76:22). David developed a relationship of "[p]ure trust" with Sam. (Tr. at 76:23–76:25).

### II.    David and Sam's formation of Grain Systems Ukraine

GSI would encourage and support individuals, including GSI employees, who opened dealerships for GSI products in underserved regions. (Tr. at 77:1–77:13). In the

early 2000s, David and Sam worked together to become dealers of GSI products in Ukraine, ultimately partnering in an entity called Grain Systems Ukraine ("GSU"). (Doc. #54, p. 3, ¶ 18; Tr. 11:16–11:25).

David believed that GSU had its first transaction in about 2000. (Tr. at 80:23–81:9). The end user of a grain bin would pay GSI, who would in turn pay GSU a commission or "margin." (Tr. at 122:23–123:5, 124:10–124:17).

David did not know the business structure of GSU in Ukraine. (Tr. at 126:7–126:12). David left the administrative activities in Ukraine to Sam, and David handled business matters in the United States. (Doc. #54, pp. 3–4, ¶¶ 19 & 25). David didn't have any knowledge about GSU's banking activities, (Tr. at 113:24–114:3), nor did he know whether any income tax was paid to Ukraine on the funds earned in Ukraine. (Doc. #54, p. 4, ¶ 25). David left the business matters in Ukraine, including local taxation, to Sam. (Tr. at 13:5–13:21; 126:13–126:20).

David left GSI in 2010 after working there for seventeen years. (Doc. #54, p. 2, ¶ 5). David was self-employed as a consultant for GSU for about two years after he left GSI. (Tr. at 9:14–9:24).

### III.    David's opening of the BSI Account

During the course of David's work in Europe, Sam introduced David to Albert, a successful man from Belgium who sold helicopters and military equipment. (Doc. #54, p. 3, ¶ 20; Tr. at 93:2–93:19). David thought of Albert as "a great guy," and David developed trust in Albert. (Tr. at 93:20–93:25).

GSU generated sales for about five years before finally making a distribution to David. (Tr. at 80:11–80:22, 124:18–124:24). David was concerned about keeping the funds distributed from GSU in Ukraine because he perceived Ukraine as an unsafe place

to deposit money. (Tr. at 12:18–12:21, 18:12–18:14, 85:6–86:3). Albert recommended that David deposit the GSU distributions at Banca della Svizzera Italiana ("BSI"). (Tr. at 91:20–92:1). Albert apparently knew Georges Khneysser at BSI, and Albert arranged for David's meeting with Georges at BSI. (Tr. at 92:2–92:14, 119:17–119:22).

Accordingly, in 2006, David set up the "BSI Account" at BSI in Geneva, Switzerland, for purposes of depositing the funds distributed from GSU. (Doc. #54, pp. 2–3, ¶¶ 12 & 14–16). David met with Georges at a restaurant and hotel, and the next day, David met with Georges at BSI along with Sam. (Doc. #54, p. 3, ¶ 17). At his initial meeting to set up the BSI Account, David does not recall discussing whether the funds in the BSI Account were subject to taxation by the United States or any other country. (Doc. #54, p. 3–4, ¶¶ 22–23). When David and Sam met with BSI together, nothing that occurred caused David to ask Sam any questions; Sam likewise never indicated to David that the structure of the BSI Account might be a problem. (Tr. at 99:13–99:23).

David signed the paperwork to establish the BSI Account. (Doc. #54, p. 4, ¶ 26). When David opened the BSI Account, he didn't ask about any of the documents that he was signing—BSI gave David one page after another to sign. (Tr. at 17:24–18:11). David signed documents relating to the BSI Account even though some were written in a language that he could not read. (Doc. #54, p. 6, ¶ 43). David had sole signature authority on the BSI Account. (Doc. #54, p. 4, ¶ 27).

BSI collected administrative fees on David's deposit, as well as commissions to hold David's mail. (Doc. #54, p. 6, ¶¶ 49–50; Tr. at 102:10–103:25). But BSI did not meaningfully discuss the mail-holding service with David:

> "Q. And do you recall [BSI] specifically discussing that hold mail service with you?

> A.  No. The discussions were they understood that I was traveling in the region on a frequent basis. And so they just said, Hey, this is going to be easy. You just swing by and we can review all of the account status and get decisions from you if you wanted to be involved with investments or cash withdrawals, whatever. I mean, it was all just to be done when I met them face to face."

(Tr. at 110:24–111:7). David did not actually know what BSI did in order to earn the "commission" to hold his mail. (Tr. at 104:1–104:11).

The BSI Account also included a corresponding investment account. (Doc. #54, p. 2, ¶ 13). At the first meeting at BSI, David and Georges discussed the BSI Account and investments that BSI would make with the funds deposited in the account. (Doc. #54, p. 3, ¶ 21). David hoped that the representatives at BSI would serve as financial advisors with respect to the investments, but he did not know if BSI's investment strategy also included any tax strategy. (Doc. #54, p. 4, ¶ 29). David never gave BSI any specific directives on how to invest the deposited funds, just as he never gave his investment advisors in the United States any directives. (Tr. at 97:7–97:14). BSI ultimately invested the GSU distributions that David deposited, and these investments generated income or losses, with any income deposited back into the BSI Account. (Doc. #54, p. 4, ¶ 28).

David never discussed his United States taxes with BSI. (Tr. at 34:16–34:18). BSI was not involved with the filing of David's income tax returns. (Doc. #54, p. 4, ¶ 24). David does not know if Georges had any knowledge of United States tax law; David simply didn't think about the issue. (Doc. #54, p. 7, ¶ 54). BSI also did not provide accounting services to David. (Doc. #54, p. 12, ¶ 96).

David's BSI Account was held in the name of Wanstead International, LTD ("Wanstead"), rather than in David's own name. (Doc. #54, p. 4, ¶ 31). David was the beneficial owner of the BSI Account, (Doc. #54, p. 5, ¶ 32), but no one at BSI explained

to David what it meant to be the "beneficial owner." (Tr. at 101:8–101:17, 120:1–120:6). Wanstead was a company purportedly domiciled in Belize, (Doc. #54, p. 5, ¶ 33), although David had no connection to Belize. (Doc. #54, p. 5, ¶ 34). BSI did not tell David why he had to select a company or what Wanstead did. (Doc. #54, p. 5, ¶ 36).

David didn't ask anyone to prepare the certificate of incorporation for Wanstead, (Tr. at 91:4–91:12), and the certificate of incorporation for Wanstead indicated that the entity was formed even before David opened the BSI Account. (Tr. at 91:13–91:19; Ex. 16, p. 35, 44, 62). All of the paperwork relating to Wanstead was handled at BSI in Switzerland. (Tr. at 14:11–14:22). David merely selected the Wanstead name from a list. (Doc. #54, p. 5, ¶ 35; Tr. at 114:13–115:18, 119:5–119:13). David now believes that Wanstead was a "sham entities," as described in BSI's non-prosecution agreement. (Tr. at 108:23–109:5; Ex. 103, p. 2, ¶ 9).

David testified that he was simply given the BSI documents to sign, and he did not ask BSI any questions. (Tr. at 120:7–120:10). David also didn't ask why he needed to choose an entity, like Wanstead, when he opened the BSI Account. (Doc. #54, p. 5, ¶ 37; Tr. at 15:1–15:11). David assumed that he was just following the "formalities" or "protocol" of establishing an account with BSI. (Tr. at 25:2–25:25).

The professionals at BSI understood that David was a United States citizen. (Tr. at 96:21–96:24). David did not designate any beneficiaries on the BSI Account or provide any instructions for the event of his death. (Tr. at 28:15–29:3). To David's knowledge, his wife, Crystal, and his business partner in GSU, Sam, wouldn't have been able to access the funds in the BSI Account if something happened to him. (Tr. at 30:3–30:16). As far as

8

David knew, the funds in the BSI Account would be subject to whatever procedures BSI had in place for unclaimed funds. (Tr. at 31:1–31:5).

Ultimately, David believed that BSI was looking out for the best interests of the *funds* deposited at BSI. (Tr. at 96:25–97:6). Consistent with the statements in BSI's non-prosecution agreement, David believed that BSI profited from the BSI Account. (Tr. at 109:12–110:4; Ex. 103, p. 2, ¶ 10).

## IV.  David's intention to use the GSU funds for a venture in Turkey

David and Sam also worked together to establish a separate business in Turkey to manufacture grain bins. (Doc. #54, p. 3, ¶ 18; Tr. at 23:2–23:10, 65:14–65:16). David's plan was for the funds in the BSI Account to be used for the venture in Turkey. (Tr. at 94:1–94:4). He also used some of the funds in the BSI Account towards an undeveloped venture with Albert in Chad. (Tr. at 93:12–93:19, 95:3–95:9). David did not bring any of the money earned in Ukraine back to the United States; all of the funds were intended for the grain bin manufacturing facility in Turkey. (Tr. at 65:14–65:18). David's withdrawals from the BSI Account funded these business activities, (Doc. #54, p. 6, ¶ 48), and when David closed the BSI Account in 2011, he transferred the funds that remained to an account in Turkey for his investment. (Doc. #54, p. 7, ¶ 55; Tr. at 121:25–122:6).

## V.  David's lapse in disclosing the BSI Account

Prior to 2014, David did not openly discuss the BSI Account with anybody, including his tax preparer in the United States. (Doc. #54, p. 4, ¶ 30). David never asked his tax preparer any questions about any foreign income when she was preparing David's 2006 through 2011 federal income tax returns. (Doc. #54, p. 10, ¶ 80). David did not tell his tax preparer that he earned income outside of the United States, and he did not ask

her what he would need to do if he earned income outside of the United States (Doc. #54, p. 10, ¶¶ 81 & 82).

David did not believe that he needed to worry about United States taxes because he received the money from activities in Ukraine, because the money stayed in Europe, and because the money was ultimately going to Turkey. (Doc. #54, pp. 7–8 & 11, ¶¶ 52, 67 & 90). David didn't even think about asking his tax preparer whether any taxes would be due on the money in the BSI Account:

> Q. Now, before 2014, you never asked Terri Phelps whether you had to pay tax on the money that was held in your BSI account?
> A. That's correct.
> Q. That was money that was generated from Ukraine?
> A. Right.
> Q. You expected that if you gave information about income to Terri Phelps, she'd report it on your tax return, right?
> A. That -- what do I say about that? I mean, it never got discussed because it was -- it stayed in Switzerland and was destined for Turkey. So I never even -- *those thoughts never even crossed my mind*.
> Q. But there was no harm in asking Terri to confirm that understanding, right?
> A. I could have talked to anybody I'd want to, *but I would never even think of that.*

(Tr. at 48:7–48:22 (emphasis added)). David agreed that he could have asked for assistance in the United States about tax liability for the BSI Account "if [he] would have had the knowledge and understanding that [he] needed to do it." (Tr. at 66:6–66:10). David believed that he would be notified in the event that he needed to pay any taxes in Switzerland, Ukraine, or Belieze, but in David's testimony: "nothing was ever brought to my attention. There was never any issues." (Tr. at 100:18–101:7 (emphasis added)).

Although David's tax preparer sent him an "organizer" each year containing questions and identifying necessary documents, David never filled out the organizer by answering the questions. (Doc. #54, p. 9, ¶ 70). As a result, on Line 7a of the Form

Schedule B attached to each of David's 2006 through 2011 federal income tax returns, the box asking whether the taxpayer held an interest in or other authority over a financial account in another country is marked "no." (Doc. #54, p. 11, ¶ 90). According to David's tax preparer, Line 7a was checked "no" because David did not disclose to her that he had a foreign account. (Doc. #54, p. 12, ¶ 94). David did not review his tax returns before signing them. (Tr. at 45:8–45:14).

When David started consulting for GSU, GSU paid David directly to his United States bank account, and David reported this income to his tax preparer. (Tr. at 49:8–50:16). Because of his foreign consulting income, David's tax preparer asked David additional questions about foreign bank accounts. (Tr. at 50:17–51:6). David then filed an FBAR for 2012 disclosing the existence of a bank account that David held in Turkey, (Doc. #54, p. 12, ¶ 99), which David had opened in 2012. (Tr. at 50:22–50:23). David didn't tell his tax preparer about the BSI Account at the time of the FBAR for the Turkish bank account because the BSI Account was already closed. (Tr. at 51:22–52:1, 53:8–53:16).

## VI.   Agent Urtecho's investigation of David

The February 2014 letter from BSI was the first notice that David received of a tax or reporting problem with the BSI Account. (Tr. at 105:20–25). After receiving the letter from BSI, David contacted his tax preparer. (Doc. #54, p. 12, ¶ 102; Tr. at 106:4–106:19). David's tax preparer then filed amended tax returns for tax years 2006 through 2011 to include the income that David earned from the activities in Ukraine. (Doc. #54, p. 13, ¶ 109). David's tax preparer also helped him to prepare FBAR forms. (Tr. at 67:7–67:9).

David initially participated in the Offshore Voluntary Disclosure Program, a program with a different penalty percentage that was designed to bring taxpayers back into compliance. (Tr. at 106:4–106:19, 131:25–132:10). Trusting the advice of his first

attorney, David withdrew from the Offshore Voluntary Disclosure Program. (Tr. at 106:20–107:7, 156:17–157:7).

After David left the Offshore Voluntary Disclosure Program, Agent Elizabeth Urtecho was assigned to the examination of David's case. (Tr. at 131:20–131:24). Agent Urtecho claimed that David did not provide her with certain documents, including the formation documents for Wanstead. (Tr. at). Although Agent Urtecho had already received documents from her manager regarding the formation of Wanstead at the beginning of the case, she still asked for these documents from David. (Tr. at 138:11–138:18, 149:14–150:10).

Whenever David's first attorney requested documents from him, David promptly provided the requested documents to the attorney. (Tr. at 157:8–157:12). David himself couldn't obtain documents easily from BSI or from Belize. (Tr. at 157:13–157:24). David's first attorney—the one who had encouraged David to opt out of the lucrative Offshore Voluntary Disclosure Program—stepped down from the case and admitted that he had done "a lousy job" for the Vettels. (Tr. at 156:14–157:7, 157:25–158:16).

David did not intentionally fail to provide information to the IRS. (Tr. at 160:1–160:4). Indeed, David never even blamed his tax preparer for the failure to report the BSI Account, acknowledging that "it's all on me." (Doc. #54, p. 13, ¶ 106). David has also been paying the income tax deficiency through a payment plan. (Tr. at 36:1–36:9).

## ARGUMENT

**I.    The United States may meet its burden of proof by establishing that David violated federal tax law in a manner that was knowing, willfully blind, or reckless—but not negligent**

As recognized by the Third Circuit, "the proper standard for willfulness is 'the one used in other civil contexts—that is, a defendant has willfully violated [31 U.S.C. § 5314]

12

when he either knowingly or recklessly fails to file [an] FBAR.'" *Bedrosian v. United States* (*Bedrosian II*), 912 F.3d 144, 152 (3d Cir. 2018) (first alteration in original) (quoting *Bedrosian I*, 2017 WL 4946433, at *3). *See also United States v. Gentges*, 531 F. Supp. 3d 731, 743 (S.D.N.Y. 2021) (holding that "for purposes of the civil penalties provision in § 5321(a)(5)(C)(i), a willful violation of the FBAR reporting requirement includes both knowing and reckless violations of the statute").

In addition to knowing and reckless conduct, an inference of "willful blindness" can also meet the standard of willfulness. *See, e.g.*, *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1083 (S.D. Cal. 2021) (recognizing that the Supreme Court "recently held that willful blindness also meets the willfulness requirement in a civil case" (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011))); *Gentges*, 531 F. Supp. 3d at 74 (reasoning that "'willful blindness or reckless disregard satisfies the required mental state' for purposes of a willful violation of the FBAR reporting statute" (quoting *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 124 (D.D.C. 2017))); *United States v. Williams* (*Williams II*), 489 F. App'x 655, 658 (4th Cir. 2012) (recognizing "willful blindness" standard).

Nonetheless, "civil recklessness requires proof of something more than mere negligence: 'It is [the] high risk of harm, objectively assessed, that is the essence of recklessness at common law.'" *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (alteration in original) (quoting *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 69 (2007)). As explained by the District of Hawaii, negligence is distinct from actual knowledge, willful blindness, and recklessness:

> Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a

13

> finding of willfulness. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not.

*Kurotaki v. United States*, No. 1:22-cv-00063, 2023 WL 6604892, at *5 (D. Haw. Oct. 10, 2023) (unpublished opinion) (quoting *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833–34 (9th Cir. 2019)). *See also Kelly*, 92 F.4th at 603 (recognizing that "civil recklessness requires proof of more than negligence" (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 596–97 (6th Cir. 2021))).

Accordingly, in order to meet its burden of proof, the United States must establish that David willfully violated federal tax law—in other words, that the violation was knowing, willfully blind, or reckless. If the United States only establishes that David's conduct was negligent, then the United States has not met its burden of proof.

## II.    The United States failed to meet its burden of proof that David acted knowingly

### A.    The United States failed to meet its burden of proof that David had actual knowledge of the FBAR reporting requirement

The United States may meet its burden of proof that David acted willfully by establishing that David "knowingly" failed to file an FBAR. *See Bedrosian II*, 912 F.3d at 152 (recognizing that a defendant willfully violates Section 5314 when the defendant "either knowingly or recklessly fails to file [an] FBAR" (quoting *Bedrosian I*, 2017 WL 4946433, at *3). "A knowing violation requires *actual knowledge* of the FBAR reporting requirement." *United States v. DeMauro*, 483 F. Supp. 3d 68, 82 (D.N.H. 2020) (emphasis added) (citing *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994)). *See also Knowing*,

Black's Law Dictionary (11th ed. 2019) (defining the word "knowing" as "[d]eliberate; conscious").

Based on the definition of a "knowing violation" in *DeMauro*, the evidence at trial did not establish that David had *actual knowledge* of the FBAR reporting requirement. David's testimony that he didn't think of talking to his tax preparer about the BSI Account shows that David's conduct was not deliberate or conscious. The United States failed to meet its burden of proof that David acted willfully through knowing conduct.

**B.   The signed 2006 to 2011 tax returns do not establish that David had "actual knowledge"**

At trial, the United States questioned David on his 2006 to 2011 tax returns, eliciting testimony from David that he did not read his tax returns before signing them. In *United States v. Burga*, the Northern District of California observed that "courts are split as to whether signing a tax form puts a person on constructive notice of the FBAR requirements such that the failure to comply is evidence of willfulness." --- F. Supp. 3d ----, ----, No. 5:19-cv-03246, 2023 WL 8190173, at *10 (N.D. Cal. 2023). In an FBAR case involving *non*-willful violations, the District of Nebraska recognized that "[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." *United States v. Hidy*, 471 F. Supp. 3d 927, 933 (D. Neb. 2020) (quoting *Williams II*, 489 F. App'x at 659).

The Central District of California expressed concern with applying this constructive-knowledge rule to the willfulness standard, observing that "signing a tax return on its own cannot automatically make the taxpayer's violation 'willfull' [sic] as that would collapse the willfulness standard to strict liability." *Jones v. United States*, No. 2:19-cv-04950, 2020 WL 2803353, at *9 (C.D. Cal. May 11, 2020) (unpublished opinion). The

Southern District of Texas likewise refused to hold that a taxpayer had constructive knowledge merely because the taxpayer signed his tax returns. *United States v. Flume*, No. 5:16-cv-00073, 2018 WL 4378161, at *8 (S.D. Tex. Aug. 22, 2018) (unpublished opinion). In *United States v. Schwarzbaum*, the Southern District of Florida reasoned that imputing constructive knowledge to a taxpayer who signed a tax return "would lead to a draconian result and one that would preclude a consideration of other evidence presented." 611 F. Supp. 3d 1356, 1368 (S.D. Fla. 2020).

The use of a signed tax return to infer actual knowledge of the FBAR reporting requirement first arose in the case of *United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012). *See* Kyle Niewoehner, Comment, *Feigning Willfulness: How Williams and McBride Extend the Foreign Bank Accounts Disclosure Willfulness Requirement and Why They Should Not Be Followed*, 68 Tax Law. 251, 251 (2014). In *McBride*, however, the District of Utah pointed to additional evidence beyond the signed tax return to establish the taxpayer's actual knowledge. 908 F. Supp. 2d at 1208–09. Specifically, the taxpayer hired a financial management firm to avoid disclosure of his foreign accounts, and the taxpayer had read marketing materials from the financial management firm informing him of his reporting duties. *Id.* The District of Utah also observed that the taxpayer was not credible in light of his misleading and untruthful interviews, contradictory testimony, and evasive course of conduct. *Id.* at 1209. The *McBride* court considered its inference of knowledge to be consistent with *United States v. Sturman*, 951 F.2d 1466 (6th Cir. 1991), *id.* at 1207, yet the taxpayer in *Sturman* admitted that he had *actual* knowledge of the question on his tax return regarding foreign accounts—not simply constructive knowledge. 951 F.2d at 1477.

Despite the cases interpreting a signed tax form as evidence of constructive knowledge, "[a] knowing violation requires *actual knowledge* of the FBAR reporting requirement." *DeMauro*, 483 F. Supp. 3d at 82 (emphasis added) (citing *Ratzlaf*, 510 U.S. at 141). Actual knowledge and constructive knowledge are not the same:

> In everyday speech, "actual knowledge" might seem redundant; one who claims "knowledge" of a topic likely means to suggest that he actually knows a thing or two about it. But the law will sometimes impute knowledge—often called "constructive" knowledge—to a person who fails to learn something that a reasonably diligent person would have learned.

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. ----, ----, 140 S. Ct. 768, 776 (2020) (citing *Knowledge*, Black's Law Dictionary (11th ed. 2019)).

As stated above in **Section I.**, the standard of willfulness, whether formulated as knowledge or recklessness, requires more than negligent conduct. *See Kurotaki*, 2023 WL 6604892, at *5. Nonetheless, "[a] person acts negligently if the person does not exercise reasonable care under all the circumstances." Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (Am. L. Inst. 2010). Constructive knowledge, or "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person[,]" *Knowledge*, Black's Law Dictionary (11th ed. 2019), corresponds with the meaning of negligent conduct, not willful conduct.

Here, the evidence regarding the 2006 to 2011 tax returns does not meet the United States' burden of proof to establish a knowing violation of the reporting requirement. Because the United States also did not establish that David had *actual* knowledge of the reporting requirement, the United States has not met its burden of proof to establish a willful violation through knowing conduct.

**III.    The United States failed to meet its burden of proof that David acted with willful blindness**

As stated above in **Section I.**, a taxpayer's "willful blindness" to FBAR requirements can also meet the standard of "willfulness," just like knowing and reckless conduct. *Williams II*, 489 F. App'x at 958–59 (citing *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011)). Since the decision in *Williams II*, other federal courts have likewise considered "willful blindness" in conjunction with FBAR violations. *E.g.*, *Goldsmith*, 541 F. Supp. 3d at 1083 (citing *Global-Tech*, 563 U.S. at 766); *Gentges*, 531 F. Supp. 3d at 74 (quoting *Kelley-Hunter*, 281 F. Supp. 3d at 124); *DeMauro*, 483 F. Supp. 3d at 87 (citing *Williams II*, 489 F. App'x at 659).

In *Global-Tech*, the Supreme Court articulated the accepted two-part test for willful blindness, which incorporated a subjective element:

> While the Courts of Appeal articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.

563 U.S. at 769 (collecting cases). Consistent with the definition of "willful blindness" in *Global-Tech*, the Fourth Circuit in *Williams II* explained that "'willful blindness' may be inferred where 'a defendant was *subjectively* aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts point[ing] to such liability.'" 489 F. App'x at 958 (emphasis added) (quoting *Poole*, 640 F.3d at 122). *See also Goldsmith*, 541 F. Supp. 3d at 1083 (explaining that willful blindness satisfies knowledge requirements when "the defendant (1) *subjectively* believed there was a high probability that a fact exists and (2) takes deliberate actions to avoid learning of that fact" (emphasis added) (citing *Global-Tech*, 563 U.S. at 766)); *Kelly*, 92 F.4th at 603 (recognizing that both

criminal recklessness and willful blindness both "incorporate a *subjective* standard" (emphasis added) (quoting *Horowitz*, 978 F.3d at 89)).

Similarly, the District of New Hampshire described willful blindness as a situation in which the taxpayer "*consciously* chooses to avoid learning about reporting requirements[.]" *DeMauro*, 483 F. Supp. 3d at 82 (emphasis added) (citing *Williams II*, 489 F. App'x at 659). Furthermore, the Southern District of Florida emphasized that a determination of a taxpayer's willful blindness would "require[ ] a determination of his *subjective* awareness and whether he purposefully avoided learning the facts pointing to liability." *United States v. Kronowitz*, No. 0:19-cv-62648, 2021 WL 76344, at *8 (S.D. Fla. Jan. 8, 2021) (emphasis added) (unpublished opinion) (citing *Williams II*, 489 F. App'x at 658). When excluding expert testimony pertaining to a taxpayer's alleged willful blindness, the District of Connecticut emphasized that the expert's report failed to "address the *subjective* standard at issue here." *United States v. Garrity*, No. 3:15-cv-00243, 2018 WL 2465354, at *2 (D. Conn. June 1, 2018) (unpublished opinion) (emphasis added).

But courts discussing willful blindness have not consistently communicated or applied the necessary subjective element. For example, in *Gentges*, the Southern District of New York stated that "a defendant's subjective belief does *not* negate a finding of recklessness *or willful blindness*[.]" 531 F. Supp. 3d at 750 (emphasis added). In *McBride*, the District of Utah posited that, "[f]or an individual to have acted 'willfully,' an individual need not have been subjectively aware of the FBAR reporting requirement"; two sentences later, however, the District of Utah quoted the subjective *Global-Tech* explanation of willful blindness: "In order to demonstrate willful blindness, 'a defendant must *subjectively* believe that there is a high probability that a fact exists and the

19

defendant must take deliberate actions to avoid learning of that fact.'" 908 F. Supp. 2d at 1210 (emphasis added) (quoting *Global-Tech*, 563 U.S. at 769).

Willful blindness is also a more stringent standard than recklessness. In *Global-Tech*, the Supreme Court explained that the subjective test for willful blindness "give[s] willful blindness an appropriate limited scope that surpasses recklessness and negligence." 563 U.S. at 769. *See also Landa v. United States*, 153 F. Cl. 585, 598 (Fed. Cl. 2021) (noting that the court did not need to reach the issue of willful blindness because the taxpayer "[a]t the very least" exhibited recklessness); *DeMauro*, 483 F. Supp. 3d at 87 (finding that the taxpayer's conduct "demonstrated a reckless disregard, if not a willful blindness, towards her tax reporting obligations"); *United States v. Bohanec*, 263 F. Supp. 3d 881, 890 (C.D. Cal. 2016) (determining that the taxpayers "were at least reckless, if not willfully blind, in their conduct"); *United States v. Cohen*, No. 2:17-cv-01652, 2019 WL 8231039, at *8 (C.D. Cal. Dec. 16, 2019) (unpublished opinion) (observing in civil FBAR proceedings that, "[i]n criminal law, willful blindness is viewed as a means of proving actual knowledge, and therefore represents a higher standard than recklessness").

Like actual knowledge, the United States has not established that David had *subjective* awareness of a high probability of tax liability. David's consistent testimony was that it didn't occur to him to ask his tax preparer or others about the BSI Account. David couldn't "confirm [an] understanding" about reporting the BSI Account if he had never even thought about whether he needed to report the account. (*See, e.g.*, Tr. at 48:7–48:22). This is hardly a *conscious* choice to avoid learning reporting requirements.

David's reasons for opening the BSI account also fail to support a finding that David consciously avoided learning tax information. David temporarily placed the GSU

20

distributions in the BSI account because Ukrainian banks weren't stable. David believed that the money earned in Ukraine, held in a European bank, and then used in Turkey was not subject to tax in the United States. David's subjective belief that he owed no tax is the opposite of being "subjectively aware of a high probability of the existence of a tax liability," the first element of willful blindness identified in *Williams II*.

*Global-Tech* formulated "willful blindness" as a subjective standard, as recognized in *Kelly*, *Williams II*, and *Goldsmith*, even if other courts have inconsistently applied this subjective standard. The evidence here does not indicate that David was subjectively avoiding a suspected high probability of tax liability. Because the United States has not established that David was *subjectively* aware of the potential tax liability, the United States has not met its burden of proof to establish a willful violation of the reporting requirements through "willful blindness."

## IV.   The United States failed to meet its burden of proof that David acted recklessly

### A.   The United States failed to meet its burden of proof that David clearly ought to have known about a grave risk of not fulfilling the FBAR requirements

As explained in *Bedrosian II*, "a person 'recklessly' fails to comply with an IRS filing requirement when he or she '(1) clearly ought to have known that (2) there was a grave risk that [the filing requirement was not being met] and if (3) he [or she] was in a position to find out for certain very easily." 912 F.3d at 153 (alterations in original) (quoting *United States v. Carrigan*, 31 F.3d 130, 134 (3d Cir. 1994)). *Accord Kelly*, 92 F.4th at 603–04 (quoting *Horowitz*, 978 F.3d at 89; *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) (per curiam) (quoting *Horowitz*, 978 F.3d at 89; *Horowitz*, 978 F.3d at 89 (quoting *Bedrosian II*, 912 F.3d at 153). Additionally, and as explained above in **Section I.**,

"[r]ecklessness . . . should not be conflated with negligence[.]" *Kurotaki*, 2023 WL 6604892, at *5.

The test for recklessness articulated by the Third, Fourth, Sixth, and Eleventh Circuits respectively in *Bedrosian II*, *Horowitz*, *Kelly*, and *Rum* is conjunctive: the United States must prove that David clearly ought to have known about the grave risk that he was not meeting the FBAR requirement *and* if he was in a position to find out for certain very easily. The test for recklessness formulated by these courts also uses adverbs and an adjective to describe the extent that the United States must meet its burden of proof. Specifically, the United States must prove that David "*clearly* ought to have known" about a "*grave* risk" and that David could find out "for certain *very easily*." *See Bedrosian II*, 912 F.3d at 153 (emphasis added) (quoting *Carrigan*, 31 F.3d at 134)).

BSI was motivated to get David's business—between the "commissions," administrative fees, and murky procedures upon David's death, BSI had a substantial interest in turning a profit on David's money. BSI had every reason to rush David through a dazzling array of account opening documents and to dissuade David from questioning BSI's sophisticated procedures. In light of its acknowledged desire to profit from foreign account holders, (Tr. at 109:12–110:4; Ex. 103, p. 2, ¶ 10), BSI would have no reason to put David in a position where he *clearly* ought to have known about any United States tax risks relating to his interest in the BSI Account.

Recklessness involves an objective standard, *Kelly*, 92 F.4th at 603, and the evidence in this case does not raise an inference that a person in David's position *clearly* ought to have known of a *grave* risk that he or she was not meeting the FBAR requirements. David merely signed the documents presented to him by the suave BSI

representatives—David himself did not bring about the mail-holding commission, the investment of funds in non-United States securities, or the use of a shell entity. To David, these things appeared to be a part of BSI's "formalities" or "protocol" for establishing an account.

And once David learned of the potential FBAR violation in 2014, David reached out to his tax preparer and started the process of remedying his violation, paying income tax on the funds earned in Ukraine. David's initial attorney admitted to doing "a lousy job" in representing David and his wife, and David believed that he had responded to Agent Urtecho's requests for documents—documents that were difficult, if not impossible, for David to obtain from BSI and Belize, and that Agent Urtecho already had.

Viewed as a whole, and particularly in light of BSI's motives to deposit David's earnings from Ukraine in the BSI Account, the United States has not met its burden of proof to establish that David's conduct was "reckless" and thereby a *willful* violation of the reporting requirements.

**B.    The signed 2006 to 2011 tax returns do not establish that David acted recklessly**

The signing of the 2006 to 2011 tax returns does not support a finding of recklessness without other supporting evidence. As noted above at **Section II.B.**, the Southern District of Florida in *Schwartzbaum* reasoned that imputing constructive knowledge based solely on a signed tax return would lead to a "draconian result" precluding the consideration of other relevant evidence. 611 F. Supp. 3d at 1368. An example of the "draconian result" contemplated in *Schwartzbaum* is the case of *Kimble v. United States*, in which the Court of Federal Claims considered the only relevant evidence of "reckless disregard" to be the taxpayer's stipulations that she did not review her tax

returns and that she incorrectly responded "no" to the question about foreign accounts. 141 Fed. Cl. 373, 385–86 (Fed. Cl. 2018).

Even the courts that ostensibly consider a signed tax return as sufficient evidence to establish the taxpayer's recklessness recognize and discuss other evidence supporting the court's finding. *E.g.*, *Williams II*, 489 F. App'x at 660 (considering the taxpayer's guilty plea allocution in a separate criminal matter, in which the taxpayer acknowledged willfulness and the existence of a "larger scheme of tax evasion[,]" to be further confirmation that the taxpayer's violation was willful); *Gentges*, 531 F. Supp. 3d at 750–52 (discussing and considering "several additional factors" supporting a finding of recklessness); *Norman v. United States*, 942 F.3d 1111, 1116–17 (Fed. Cir. 2019) (observing that the facts supporting a finding of willfulness, such as the taxpayer's multiple false statements during interviews with the IRS, "extend much further" than the taxpayer's failure to read her tax return).

But in this case, the other evidence does not substantiate a finding of recklessness. As discussed above in **Section IV.A.**, David's course of conduct did not involve a larger scheme of tax evasion, nor has David made false statements during the investigation of this matter. Indeed, David attempted to comply with the FBAR requirements as soon as he learned of the problem after receiving BSI's letter in 2014, and David believed that he was complying with Agent Urtecho's document requests. A finding of recklessness in David's case based solely on his signed tax returns would lead to the draconian result imagined in *Schwartzbaum* and exemplified by *Kimble*. For these reasons, the signed 2006 to 2011 tax returns do not fulfill the United States' burden of proof to establish that David acted recklessly.

24

**C.      Negligent conduct does not fulfil the United States' burden of proof to establish a willful violation**

For purposes of determining whether a violation was "willful," negligence and recklessness should not be conflated with each other. *See Kurotaki*, 2023 WL 6604892, at *5. As discussed above at **Section II.B.**, "[a] person acts negligently if the person does not exercise reasonable care under all the circumstances." Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (Am. L. Inst. 2010). Consistent with the definition of negligence, constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person[,]" *Knowledge*, Black's Law Dictionary (11th ed. 2019); the constructive knowledge arising from a signed tax return is consistent with a finding of negligence but does not alone establish recklessness.

Ultimately, David's situation is most akin to *United States v. Hidy*, a case in which the United States sought penalties for the taxpayers' *non*-willful failures to report their interests in foreign bank accounts. 471 F. Supp. 3d 927, 929 (D. Neb. 2020). In *Hidy*, the taxpayers, a husband and wife, had interests in twelve accounts at eight different foreign banks between 2009 and 2013, with aggregate balances between about $1 million and $1.5 million. 471 F. Supp. 3d at 929. The wife prepared the joint tax returns for herself and her husband, reading instructions to determine how to complete the forms. *Id.* at 929–30. For their 2009 to 2013 tax returns, the taxpayers answered "no" to the question on Line 7a regarding financial interests in foreign accounts, and the taxpayers only filed the required FBARs in 2015 after they received an audit notice from the IRS. *Id.* at 930. The District of Nebraska agreed with the United States that the taxpayers had engaged in a *non*-willful failure to comply with the Bank Secrecy Act. *Id.* at 934.

25

At most, David's signed tax returns, David's failure to examine the rapidly-presented BSI documents, and David's disinclination to question the processes of sophisticated Swiss bankers together show a course of negligent conduct, but not reckless conduct. The United States bears the burden of proof to establish that David acted willfully by a preponderance of the evidence. *McBride*, 908 F. Supp. 2d at 1201 (citing *Williams I*, 2010 WL 3473311, at *1). Establishing that David was merely negligent—that is, establishing what a person using reasonable care would have done—is not sufficient to fulfill the United States' burden of proof.

**CONCLUSION**

Taking the trial evidence and stipulated facts together, the United States failed to meet its burden of proof to establish that David acted willfully. David's signed tax returns do not fulfill the standards of knowing or reckless conduct, and neither actual knowledge nor the requisite subjective element of willful blindless are present in this case.

BSI was financially motivated to have David open the BSI Account and to investigate as little as possible about any risks associated with the BSI Account. Objectively, a person in David's position would not have *clearly* known of a *grave* risk that he or she was violating the FBAR requirements. At most, David's conduct was negligent, but negligence does not establish willfulness.

David asks that the Court find that his violations were not willful and therefore dismiss the United States' claim for $737,314.30 in penalties, interest, and fees.

DAVID VETTEL, Defendant,

By /s/ Ryan P. Watson
    Ryan P. Watson, #25597
    John Andrew McWilliams, #25798
    GROSS WELCH MARKS CLARE,
      P.C., L.L.O.
    1500 Omaha Tower
    2120 South 72nd Street
    Omaha, NE  68124
    (402) 392-1500
    rwatson@gwmclaw.com
    jmcwilliams@gwmclaw.com
    *Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Closing Argument Brief complies with NECivR 7.1(d) and further certify that the word-count function was applied to all text, including the caption, headings, and quotations. This document was prepared using Microsoft Word for Office 365, Version 2401, and contains 7954 words.

/s/ Ryan P. Watson

14375-1/6Q01853