IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-3099 |
| | ) | |
| DAVID L. VETTEL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' POST-TRIAL BRIEF**

The United States submits this post-trial brief in support of its suit to recover civil

penalties assessed against David Vettel for willfully failing to disclose his interest in a foreign

bank account in Switzerland from 2006 through 2011.  The evidence admitted at trial, including

Vettel's own statements and the stipulated facts ("SFs", *see* ECF No. 34), show that for years

2006, 2007, 2008, 2009, 2010, and 2011, Vettel willfully failed to report to the U.S. Treasury

Department his interest in a financial account he maintained (under the name of a foreign, sham

entity) at BSI SA Bank ("BSI") in Switzerland (the "BSI Account").

For the years in issue here, all United States citizens and permanent residents were

required to annually report their foreign bank accounts to the U.S. Treasury on a Form TD F 90-

22.1, Report of Foreign Bank and Financial Accounts ("FBAR").  A United States citizen who

willfully fails to report a foreign account holding in excess of $10,000 is liable for a civil penalty

not to exceed the greater of $100,000 or 50 percent of the account balance.  A person is subject

to a penalty for a willful failure to file an FBAR under 31 U.S.C. § 5321(a)(5) if the following

four elements are met: 1) the person is a United States citizen; 2) the person had an interest in or

authority over a foreign financial account; 3) the financial account had a balance that exceeded

$10,000 at some point during the reporting period; and 4) the person willfully failed to disclose the account and file an FBAR form for the account. *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1081 (S.D. Cal. 2021)[1]; *United States v. Rum*, 2019 WL 3943250, at *7 (M.D. Fla. 2019), *report and rec. adopted*, 2019 WL 5188325 (M.D. Fla. 2019), *aff'd*, 995 F.3d 882 (11th Cir. 2021); *United States v. Schwarzbaum*, 24 F.4th 1355, 1359 (11th Cir. 2022); *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012). The IRS assessed a penalty against Vettel for his failure to disclose the BSI Account in the amount of $619,863, or 50% of the highest account balance, which was $1,239,726 on December 31, 2010.  The penalty was then spread across the six years where the BSI Account balance exceeded $10,000 and Vettel failed to file an FBAR. (SF ¶¶ 114-115.)  As of September 1, 2023, Vettel is liable to the United States in the amount of $737,314.30, which includes the FBAR penalties, interest accrued under 31 U.S.C. § 3717(a)(1), penalties for late payment under 31 U.S.C. § 3717(e)(2), and associated fees. Interest and penalties continue to accrue as provided by law.[2] (SF ¶ 118.)

The United States moved for summary judgment, and the Court granted "the United States's motion for summary judgment as to all elements of the violation of the foreign-bank reporting requirement except whether the violation was willful or not." (ECF No. 32) Thus, the

---

[1] And "[a]ll United States citizens are charged with knowledge of all federal statutes and regulations. *** Thus, '[i]t is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS.'" *Goldsmith*, 541 F.Supp.3d at 1094 (citations omitted).

[2] The amount of the penalties assessed, and the amount owed on those penalties, is not in dispute. "[S]tipulations by the parties regarding questions of fact are conclusive" and "[t]rial courts are bound by the facts established by the stipulation." *Gander v. Livoti*, 250 F.3d 606, 609 (8th Cir. 2001) (citing *Burstein v. United States*, 232 F.2d 19, 23 (8th Cir.1956)).

only remaining issue at trial was Vettel's willfulness.[3]

The evidence at trial shows that Vettel willfully failed to report his foreign bank account as required by law. This brief explains in the following order:

I.      The FBAR reporting requirement;

II.     The standard of review of the FBAR penalty assessment;

III.    The "willfulness" standard in the FBAR penalty context; and

IV.     Vettel's willfulness in failing to file FBARs.

**I.      The Foreign Bank Account Reporting Requirement**

Citizens of the United States, including Vettel, are subject to taxes on their income, regardless of where it is earned. 26 U.S.C. § 61(a); 26 C.F.R. § 1.1-1(b). The FBAR reporting requirement arises under the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq*., which was designed, in part, to combat tax evasion. *See* H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397-98 (observing that "[s]ecret foreign financial facilities, particularly in Switzerland" offered the wealthy a "grossly unfair" but "convenient avenue of tax evasion").[4] The civil FBAR penalties act "as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1372 (M.D. Fla. 2018).

---

[3] Therefore, this brief does not address the other elements of a willful FBAR violation. However, the stipulated facts establish that Vettel held the BSI Account, the BSI Account balance exceeded $10,000 each of the years 2006 through 2011, and Vettel failed to timely report the BSI Account to the Treasury. (SF ¶¶ 12-13, 26, 31-42, 97, 113.)

[4] "The United States income tax system reaches all U.S. citizens' income no matter where in the world it is earned, unless it is expressly excepted by another provision in the Tax Code." *Rogers v. Comm'r*, 783 F.3d 320, 322 (D.C. Cir. 2015) (internal quotation marks and citations omitted). "[O]ur tax structure is based on a system of self-reporting." *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). "The Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability." *Id.* at 145.

To fill the information gap, the BSA instructs the Secretary of the Treasury to require U.S. citizens "to keep records, file reports," or both, when the citizen "makes a transaction or maintains a relation . . . with a foreign financial agency." 31 U.S.C. § 5314(a). The Secretary published regulations requiring any citizen "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country" to report certain details about the account to the Treasury Department. 31 C.F.R. § 1010.350(a).[5] For the years at issue in this case, the report must be made each year by filing an FBAR with the Treasury Department no later than June 30 "with respect to foreign financial accounts exceeding $10,000 maintained during the previous . . . year." *See* 31 C.F.R. § 1010.306(c).

To alert citizens to the filing requirement, the Form Schedule B of each year's IRS Form 1040 "U.S. Individual Income Tax Return" contains the following check-the-box question in the section "Part III Foreign Accounts and Trusts":

| Part III Foreign Accounts and Trusts (See page B-2.) | You must complete this part if you **(a)** had over $1,500 of taxable interest or ordinary dividends; or **(b)** had a foreign account; or **(c)** received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | | Yes | No |
|---|---|---|---|---|
| | **7a** At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 . . . . . . | | | |
| | **b** If "Yes," enter the name of the foreign country ▶ ............................................ | | | |
| | **8** During 2007, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See page B-2 . . . . . . . . | | | |
| For Paperwork Reduction Act Notice, see Form 1040 instructions. | | | | Schedule B (Form 1040) 2007 |

*See, e.g.*, Exs. 1-4, 6, 8, Vettel's 2006-2011 IRS Form 1040 Income Tax Returns, at Schedule B. The instructions for Schedule B require "Yes" to be checked on line 7a if the filer had authority

---

[5] Treasury Regulations applicable to FBAR penalties were contained in the Code of Federal Regulations Title 31, part 103, until 2010 when they were moved to Title 31, Part 1010. *See* 31 C.F.R. § 1010.350(a); 31 C.F.R. § 1010.306(c). For convenience, the most recent location of these regulations is cited.

to sign or direct the use of a foreign account.[6]  Schedule B further refers taxpayers to Form TD F 90–22.1, which provides specific instructions for reporting a financial interest in or authority over bank accounts, securities accounts, or other financial accounts in a foreign country. *Id.*; *McBride*, 908 F. Supp. 2d at 1200 n.2; *United States v. Flume*, 390 F. Supp.3d 847, 857 (S.D. Tex. 2019) ("Schedule B's question about foreign bank accounts is simple and straightforward and requires no financial or legal training to understand. Even the most cursory review of his tax return would have alerted [the defendant] to the foreign-account reporting requirement.").

The Secretary of the Treasury is authorized to impose a civil penalty on any person who does not comply with the requirement to report a foreign bank account. 31 U.S.C. § 5321(a)(5). Where the failure is "willful," the amount of this penalty cannot exceed the greater of $100,000 or 50 percent of the account balance at the time of the violation. 31 U.S.C. § 5321(a)(5)(C)(i); 31 U.S.C. § 5321(a)(5)(D). There is no reasonable cause exception for a willful violation. 31 U.S.C. § 5321(a)(5)(C)(ii).

## II.    Standard of Review

A district court makes a *de novo* determination as to whether a defendant is liable for the

---

[6] The instructions for Schedule B for tax years 2006 through 2010 instructed taxpayers to check "no" if the "combined value of the accounts was $10,000 or less during the whole year." For tax year 2011, the instructions for Schedule B instructed taxpayers to "Check the "Yes" box even if you are not required to file Form TD F 90-22.1." *See* 2006 Instructions for Schedules A & B (Form 1040); 2007 Instructions for Schedules A & B (Form 1040); 2008 Instructions for Schedules A & B (Form 1040); 2009 Form 1040 Instructions; 2010 Schedule B General Instructions; and 2011 Schedule B General Instructions, *available at* https://www.irs.gov/forms-pubs/prior-year.

The Court is requested to take judicial notice (pursuant to FRE 201) of the instructions to Schedule B for each of the years at issue and which are found on the IRS's website. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (recognizing "the authority of a court to take judicial notice of government websites")).

FBAR penalty arising from his failure to meet the reporting requirements. *United States v. Williams*, 2010 WL 34773311, at *1 (E.D. Va. 2010), *rev'd on other grounds*, 489 Fed. Appx 655 (4th Cir. 2012); *McBride*, 908 F. Supp. 2d at 1201. "The Government bears the burden to prove by a preponderance of the evidence that a defendant willfully violated the FBAR requirements." *Flume*, 390 F. Supp. 3d at 854; *United States v. Garrity*, 304 F. Supp. 3d 267, 270 (D. Conn. 2018) ("[E]very court that has answered the question ... has held that the preponderance of the evidence standard governs suits by the government to recover civil FBAR penalties.").

### III.    The Legal Standard for Willfulness in Failing to File an FBAR

#### A.    Willfulness Includes Knowing *or* Reckless Conduct

Section 5321 authorizes a penalty for willful violations of the reporting requirement but fails to define the term "willful." 31 U.S.C. § 5321.  The Supreme Court has made clear that "where willfulness is a statutory condition of civil liability," the term covers "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). In civil cases, recklessness refers to "conduct violating an *objective standard*: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. at 68 (emphasis added) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Following this guidance, "willfulness" under 31 U.S.C. § 5321 also includes reckless disregard of a statutory duty. *See United States v. Kelly*, 92 F.4th 598, 603 (6th Cir. 2024) ("for purposes of an FBAR civil penalty, a willful violation of the FBAR reporting requirements includes both knowing and reckless violations. In so holding, we join every other circuit to have addressed this issue."); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) ("[W]illfulness in the context of § 5321(a)(5)(C) includes recklessness."); *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) ("With respect to IRS filings in particular, a person

6

'recklessly' fails to comply with an IRS filing requirement when he or she '(1) clearly ought to have known that (2) there was a grave risk that [the filing requirement was not being met] and if (3) he [or she] was in a position to find out for certain very easily.'"); *Williams*, 489 Fed. App'x at 660 ("reckless conduct … satisfies the proof requirement under § 5314."); *United States v. Harrington*, 2024 WL 839363, at *8 (D. Colo. 2024) ("because the Tenth Circuit has yet to rule on the subject, the Court is persuaded by the holdings of the Third, Fourth, Eleventh, and Federal Circuits that willfulness in the context of failing to file FBARs includes not only knowing failures to file but also reckless failures."); *United States v. Reyes*, 2024 WL 437096, at *5-6 (E.D.N.Y. 2024) ("Although the Second Circuit has not yet addressed the meaning of 'willful' in the context of Section 5321(a)(5), the Supreme Court has stated that 'where willfulness is a statutory condition of civil liability,' it will generally be construed to include 'not only knowing violations of a standard, but reckless ones as well' … Consistent with all the courts that have considered this issue, the Court finds that a showing that Defendants recklessly failed to fail FBARs would result in civil penalties under Section 5321(a)(5)(C)."), *appeal pending*, C.A. No. 24- 286 (2d Cir.).

### B. Recklessness includes Willful Blindness.

"An additional subcategory of recklessness has been recognized by courts referred to as 'willful blindness.'" *United States v. Kelly*, 2023 WL 3212718, at *5 (E.D. Mich. 2023), *aff'd*, 92 F.4th 598 (6th Cir. 2024). *See Kimble v. United States*, 141 Fed. Cl. 373, 385 (2018), *aff'd*, 991 F.3d 1238 (Fed. Cir. 2021); *Goldsmith*, 541 F. Supp. 3d at 1084 ("Although disjointed, the sum result of the relevant caselaw interpreting the willfulness standard for FBAR-reporting violations is that a willful violation may be found where the violation results from conduct qualifying as either (1) knowing and intentional or (2) reckless, including due to willful blindness." (citing

7

*United States v. DeMauro*, 483 F. Supp. 3d 68, 82 (D.N.H. 2020)); *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157 (D. Nev. 2020) ("Acting with "'willful blindness' to the obvious or known consequences of one's actions" also satisfies the willfulness standard… Evidence of conduct intended to 'conceal or mislead sources of income or other financial information' is evidence of willful blindness and recklessness.") (internal citations omitted); *United States v. Toth*, 2019 WL 7039627, at *6 (D. Mass. Dec. 20, 2019), *aff'd*, 33 F.4th 1 (1st Cir. 2022) ("Willfulness applies to conduct that is reckless or willfully blind."); *United States v. Ott*, 441 F. Supp. 3d 521, 532 (E.D. Mich. 2020); *United States v. Garrity*, 2018 WL 2465354, at *2 (D. Conn. June 1, 2018) ("Actual knowledge encompasses 'willful blindness' to the obvious or known consequences of one's actions… The government may prove willful blindness with evidence that Mr. Garrity, Sr. made a 'conscious effort to avoid learning about reporting requirements.'"); *United States v. Gregory*, 2019 WL 13203768, at *3 (N.D. Fla. Oct. 7, 2019) ("Willfulness does not require actual knowledge of the duty to report interest in a foreign financial account, but merely reckless or careless disregard of that statutory duty… Willfulness may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information, and it can be inferred from a conscious effort to avoid learning about reporting requirements… commonly referred to as 'willful blindness.'") (internal citations and quotation marks omitted); *United States v. Miga*, 2021 WL 8016223, at *3 (N.D. Tex. 2021) ("reckless failures to file the FBAR include those made through willful blindness, 'where a defendant consciously chooses to avoid learning about reporting requirements'" (citing *Flume*, 390 F. Supp. 3d at 854); *Jones v. United States*, 2020 WL 4390390, at *6 (C.D. Cal. 2020) ("Where a taxpayer makes a conscious effort to avoid learning about reporting requirements, evidence of such willful blindness is a sufficient basis to establish willfulness."); *Kurotaki v.*

8

*United States*, 2023 WL 6604892, at *5 (D. Haw., 2023) (collecting cases).

Acting with "'willful blindness' to the obvious or known consequences of one's actions" satisfies the willfulness standard. *McBride*, 908 F.Supp.2d at 1205 (citing *Global–Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 766 (2011)). The government can show willful blindness by evidence that the defendant made a "conscious effort to avoid learning about reporting requirements." *Williams*, 489 Fed.Appx. at 659-60. Evidence of conduct to "conceal or mislead sources of income or other financial information" is evidence of willful blindness and recklessness. *Id.* at 660. The term willfulness includes all conduct that is voluntary, but not conduct that is merely accidental or unconscious. *McBride*, 908 F.Supp.2d at 1205; *Bedrosian*, 912 F.3d at 152; *Garrity*, 304 F. Supp. 3d at 274. *See also Lefcourt v. United States,* 125 F.3d 79, 83 (2d Cir. 1997).

Thus, a person willfully violates his FBAR reporting obligations when the failure to timely file a complete and accurate FBAR is any of the following three: 1) knowing, 2) reckless, <u>or</u> 3) exhibits willful blindness to the reporting requirements. *See Safeco Ins. Co*., 551 U.S. at 57; *Bedrosian*, 912 F.3d at 153; *Williams*, 489 Fed. Appx. at 658; *McBride*, 908 F. Supp. 2d at 1209-10; *United States v. Bohanec*, 263 F.Supp.3d 881, 890 (C.D. Cal. 2016). *And see Goldsmith*, 541 F. Supp. 3d at 1084.

### C.    Improper Motive is Not Necessary

Under the civil standard, an improper motive or bad purpose is not necessary to establish willfulness. *McBride*, 908 F. Supp. 2d at 1204; *Goldsmith*, 541 F. Supp.3d at 1083 (quoting *McBride, supra*) (citing *Safeco, supra*)). A subjective good faith belief that one's conduct is lawful does not preclude the imposition of a penalty in these circumstances. *See, e.g., United States v. Reyes*, 2024 WL 437096 at * 7 (E.D.N.Y. 2024) ("[A] defendant's subjective belief

does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer.") (citing *United States v. Gentges*, 531 F. Supp. 3d 731, 750 (S.D.N.Y. 2021); *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020)); *cf. Lefcourt*, 125 F.3d at 82. The relevant inquiry is whether the failure to disclose the information was purposeful instead of inadvertent, not whether the taxpayer subjectively believed he was not required to file an FBAR. *See Lefcourt*, 125 F.3d at 83 (finding that after it is established that a failure to disclose information was done purposefully, whether the filer believed he was legally justified in withholding the information is irrelevant); *McBride*, 908 F.Supp.2d at 1210 (finding that if subjective intent were required, every person would be able to escape liability by avoiding learning of the reporting requirements). *And see Reyes*, 2024 WL 437096 at ** 5-7.

### D.   Circumstantial Evidence Shows Willfulness

"Willfulness can be shown through circumstantial evidence and reasonable inferences drawn from the facts before the court." *de Forrest*, 463 F. Supp. 3d at 1157–58 (citing *McBride*, 908 F. Supp. 2d at 1204).  Direct evidence of intent is not required to establish that a violation was willful; persons who fail to file an FBAR are not likely to admit they knew of the filing requirement and chose not to comply with it. *Id.*  Consequently, a taxpayer who has a foreign bank account reasonably can be expected to read the information included in his tax return, including the reference to the FBAR on Schedule B. *See United States v. Doherty,* 233 F.3d 1275, 1282 n.10 (11th Cir. 2000) (noting that a defendant can be charged with knowledge of the contents of a tax return by signing a fraudulent form); *see also Williams*, 489 Fed. Appx. at 659; *Norman*, 942 F.3d at 1116; *Jarnagin v. United States*, 134 Fed. Cl. 368, 378 (2017) (holding that "any individual exercising ordinary business care and prudence" would read the

information specified by the government in the tax returns and then "would have made inquiry of their account about the FBAR filing requirements after having identified the clear error in the response provided to question 7a"); *McBride*, 908 F. Supp. 2d at 1206 ("It is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS.").

As applicable here, courts have considered other circumstantial evidence in finding a willful failure to file an FBAR. For example, a party's "failure to inform his accountant about the existence of a foreign account is a strong indicator of a conscious intent to violate the law." *Flume*, 390 F. Supp. 3d at 857 (citing *Bohanec*, 263 F. Supp. 3d at 890 and *McBride*, 908 F. Supp. 2d at 1212). A party's decision to not invest in U.S.-based securities using funds in a foreign account "also suggests that he understood–and sought to avoid–the withholding and disclosure requirements that accompany U.S. investments." *Flume*, 390 F. Supp. 3d at 855; *Norman v. United States*, 138 Fed. Cl. 189, 194 (2018) (finding that the defendant "concealed her financial information from U.S. authorities by signing to waive her right to invest in U.S. securities"). And, paying a fee to have the foreign bank hold bank correspondence, or using a pseudonym for a foreign account, also supports a finding of willfulness. *See Rum*, 2019 WL 3943250, at *8 (noting that taxpayer's election to have his foreign bank mail withheld abroad and decision to own a "numbered" account rather than a "name account" supported a finding of willfulness); *Norman*, 942 F.3d at 1116 (possessing a numbered account is indicative of behavior designed to conceal the account); *Goldsmith*, 541 F. Supp. 3d at 1106 ("Like the *Rum* [995 F.3d at 890–92, n.4], *Kimble* [141 Fed. Cl. at 384], *Horowitz* [978 F.3d 80,83 (4th Cir. 2020)], and *Bedrosian* [505 F.Supp.3d 502, 506–07 (E.D. Pa. 2020)] courts, this Court also finds that Mr. Goldsmith's decision to set up his account as a numbered account while also paying Basler to

hold his mail constituted at best willful blindness, and at worst, acts of concealment in reckless disregard of his tax obligations.").

The trial evidence, summarized below, establishes that Vettel acted willfully in failing to disclose the BSI Account for tax years 2006, 2007, 2008, 2009, 2010, and 2011, and Vettel is therefore liable for a willful FBAR penalty in the amount of $619,863.

### IV.   Vettel Willfully Failed to File an FBAR to Report his Foreign BSI Account for 2006 through 2011

#### A.   Vettel's Background and Experience

Vettel is a successful businessman with over 30 years of international agricultural sales experience, first at Chief Industries, then at Grain Systems Incorporated ("GSI").[7] (SF ¶¶ 4-7; Trial Transcript ("TT") at 5:20-7:23.)  Vettel's duties included handling (or overseeing in management positions) sales and sales-related tasks, such as doing market research and establishing sales forecasts and expense plans. (TT at 6:1-13, 7:5-7.)  At Chief Industries, Vettel was essentially a "one-man show." (TT at 73:16-74:2.)  GSI gave Vettel full responsibility for its international grain-related business. (TT at 6:14-7:1.)  At GSI, Vettel also established business plans, general sales and administrative costs, and sales forecasts, which involved looking at prior year corporate expenses and establishing a sales forecast to cover expenses. (TT at 7:12-20.)

Because Vettel was one of the "key people" at GSI, the owner made Vettel the president of GSI's international grain division, overseeing its business outside of North America, and offered Vettel the opportunity to become a shareholder. (TT at 7:21-8:11, 77:14-78:6, 117:4-12.)

Vettel started Grain Systems Ukraine with a colleague from GSI, Sam Moualla. (TT at

---

[7] Vettel's experience and ability was further demonstrated in that after leaving the international grain business, Vettel became the general manager of a large Nebraska-based trucking business, Sunrise Express Trucking, even though he had no previous experience working in the trucking industry. (TT at 5:11-19.)

9:22-24, 11:16-18, 11:23-25, 80:11-81:9.)  Grain Systems Ukraine worked as a dealer of GSI products in Ukraine, and received a margin or commission on sales it made in Ukraine. (SF ¶¶ 8-9; TT at 12:1-4.)  At GSI, Vettel oversaw Moualla, but Vettel claims he left all business of Grain Systems Ukraine within Ukraine to Moualla. (TT at 11:6-7, 11:11-15, 13:9-12, 13:19-24.)

The margin or commission was paid by GSI in the United States, which transmitted those funds to Grain Systems Ukraine in Europe. (TT at 12:22-25, 123:6-11, 124:10-21.)  In 2006, Vettel established the BSI Account, in person in Switzerland, to hold his share of the margins received through his Grain Systems Ukraine work. (SF ¶¶ 12-20, 44; TT at 12:1-17, 13:2-4, 124:10-24.)

BSI invested funds that Vettel deposited in the BSI Account, but Vettel is not aware if BSI's investment strategy involved any sort of tax strategy (such as tax mitigation), as Vettel never discussed that with anyone at BSI. (TT at 19:3-7.) Vettel does not recall discussing taxes being paid on the funds in the BSI Account during his initial meetings with BSI, but Vettel made clear to BSI that the funds were generated in Europe, would stay in Europe, and were destined for Turkey. (TT at 22:16-24:17.) That was his reason for the BSI Account. (TT at 34:23-25.)

### B.     Vettel Willfully Failed to Disclose the BSI Account

From 2006 to 2011, Vettel was the sole owner of the BSI Account, which was held in the name of Wanstead International, a Belize company. (SF ¶¶ 26-27, 31-32, 38, 41.)  Vettel failed to file an FBAR for these years. (SF ¶¶ 93-94, 98.)  In fact, Vettel failed to disclose this account (that had no survivorship benefits, even though he is married) to *anyone* outside of the bank and his business associate in Europe. (SF ¶¶ 2, 30, 76-77, 107; TT at 25:9-13, 26:5-10, 28:2-10, 28:15-29:3.)  Vettel checked the box "no" on the Schedule B to his Form 1040 tax returns for every year, 2006-2011, in response to the question of whether he owned a foreign bank account.

13

(Ex. 1 at 13; Ex. 2 at 9; Ex. 3 at 8; Ex. 4 at 13; Ex. 6 at 8; Ex. 8 at 10.)  The fact that Vettel did so regularly over multiple years shows that he acted willfully rather than inadvertently. Vettel's actions to conceal his BSI Account continued unabated for several years, and only changed after he closed the account and BSI sent him a letter stating that the "US Government is engaged in a widespread effort to identify US taxpayers with undeclared offshore accounts, including accounts at banks in Switzerland." (Ex. 25.)

The BSI Account existed to hold Vettel's money that was "all generated in Europe, staying in Europe, headed for Turkey. It's all activity across the pond." (SF ¶ 90.)  Vettel thus claims that he did not have to worry about taxes. (SF ¶ 52.)  But Vettel did not even question his CPA, Terri Phelps, about potential tax consequences related to the BSI Account or the funds he earned and deposited into that account.  (SF ¶¶ 77-78, 80-83, 91, 107.) *See DeMauro*, 483 F. Supp. 3d at 82–83 ("The United States demonstrates a taxpayer's recklessness and willful blindness where the taxpayer took steps to conceal the foreign bank account and did not ask a CPA about the foreign account or income earned related to the foreign account."); *Kelly*, 92 F.4th at 604 ("He opened a Swiss bank account, into which he immediately deposited over $1.8 million. He did not, however, seek professional advice about his reporting obligations or the potential tax implications of those assets… And he never consulted a tax advisor or an attorney. Given that he ought to have known about the risk of noncompliance, and could have found out by simply asking, his failure to disclose was, at the very least, reckless.").

The facts include both direct evidence of Vettel's intent to conceal his foreign bank account, and evidence of his recklessness or willful blindness, including the following:

- Vettel maintained the BSI Account in the name of Wanstead International, a Belize entity with no known business purpose, rather than an account in his own name.  (SF ¶¶ 31-42, 51. *See Landa,* 153 Fed. Cl. at 597; *Williams*, 489 Fed.Appx. at 660; *Rum*, 995 F.3d at

14

890. This provided an additional layer of anonymity. *See Goldsmith*, 541 F. Supp. 3d at 1105 ("Courts have found that both maintaining a numbered account as well as requesting a 'hold mail' service from a foreign bank qualify as evidence of intent to conceal a foreign account from the U.S. government.").

- Vettel did not create Wanstead International (such as filing incorporation documents in Belize) or ever travel to Belize for any Wanstead business, but merely signed forms at BSI (some of which may not have been filled in at the time he signed them) naming himself the director and shareholder of Wanstead. (TT at 14:17-19, 14:23-15:14, 88:18-89:4.)  Vettel never questioned: why he had to choose a company for his bank account; whether Wanstead was a real company; what business, if any, Wanstead engaged in; or whether Wanstead had any assets or liabilities.  Vettel was not concerned if he was assuming any liabilities of a Belize company, and never asked anyone at BSI any other questions about Wanstead. (TT at 15:15-16:8, 16:14-17:7.)  Vettel did not have difficulty communicating with BSI representatives because they spoke in English. (TT at 16:14-19.)

- Vettel did not report any income to taxing authorities in Belize, and even though he was in a position (as director and shareholder) to investigate whether Wanstead ever filed a tax return in <u>any</u> country, he did not do so. (TT at 17:8-23.)

- Vettel is not aware of Wanstead conducting any business, and the funds deposited in the BSI Account were generated through Vettel's work in Ukraine, not any work of Wanstead. (TT at 17:1-7.)

- Vettel did not question the substance of any documents that he signed at BSI. (TT at 17:25-18:11, 120:1-10.)

- Vettel sought to avoid U.S. taxation of the funds in the BSI Account, because, according to Vettel, the income was generated in Europe, stayed in Europe, and was destined for another investment in Europe. (SF ¶¶ 28, 48, 52, 90.)

- Vettel paid to have his account-related mail held at BSI in Switzerland rather than have statements delivered to his U.S. address. (SF ¶¶ 49-50; TT at 20:25-21:7.) Vettel thereby avoided the possibility of his BSI Account information being disclosed to the IRS. *See Bedrosian v. United States*, 42 F.4th 174, 180 (3d Cir. 2022); *United States v. Collins*, 36 F.4th 487, 492 (3d Cir. 2022); *Rum*, 995 F.3d at 890; *Horowitz*, 978 F.3d at 90; *Norman*, 942 F.3d at 1116; *United States v. Gentges*, 531 F. Supp. 3d 731, 751 (S.D.N.Y. 2021); *Landa*, 153 Fed. Cl. at 597-99; *Goldsmith*, 541 F. Supp. 3d at 1104-06; *Bohanec*, 263 F. Supp. 3d at 884; *Williams*, 489 Fed. Appx. at 660; *Reyes*, 2024 WL 437096, at *7 ("although Defendants assert that they 'do not recall ever having requested that Lloyds Bank keep mail related to their account,' it is undisputed that they paid a fee to the Lloyds Account for a 'keep mail' service, under which the bank retained all account-related correspondence, rather than sending it to Defendants at their designated address in the United States"). Vettel also only conducted BSI Account-related business in person in Switzerland. (SF ¶¶ 45-47; TT at 21:18-24, 33:3-6, 33:14-24.) Vettel never questioned anyone whether it was normal practice to hold mail at a bank. (TT at 21:8-17.)

- Vettel's BSI Account included an investment account, and Vettel directed BSI to divest from any U.S.-based securities and only invest in foreign securities or assets, signing a "Waiver of Rights to Hold U.S. Assets," and also signed a "Declaration of Non-US Tax status" when opening the BSI Account. (SF ¶ 51; TT at 18:19-24, 19:15-20:1, 20:5-21; Ex. 16 at PE-0261.) *See Flume*, 390 F. Supp. 3d at 855 ("Flume's decision to waive his right to invest his UBS account funds in U.S. securities, though far from dispositive, also suggests that he understood–and sought to avoid–the withholding and disclosure requirements that accompany U.S. investments."); *Norman*, 138 Fed. Cl. at 194 (finding that the defendant "concealed her financial information from U.S. authorities by signing to waive her right to invest in U.S. securities"); *Rum*, 995 F.3d at 890; *Bedrosian*, 42 F.4th at 180; *Collins*, 36 F.4th at 492; *Horowitz*, 978 F.3d at 90; *Norman*, 942 F.3d at 1116; *Gentges*, 531 F. Supp. 3d at 751; *Landa*, 153 Fed. Cl. at 597-99; *Goldsmith*, 541 F. Supp. 3d at 1097-1101, 1104-06; *Reyes*, 2024 WL 437096, at *7.

16

- Vettel filed six federal income tax returns, one for each of the years 2006 through 2011, falsely stating on his Schedule B that he did not have a foreign bank account; the box at line 7a, asking whether he had a foreign account, is checked "no" each year. (SF ¶¶ 93-94.) *See Collins*, 36 F.4th at 492 ("Collins repeatedly checked 'No' and filed no FBAR until 2010. He filed returns indicating he had no foreign financial accounts while managing investments worth hundreds of thousands of dollars in his French, Canadian, and Swiss accounts (even after engaging an accountant in 2005). So we agree with the District Court that Collins did not plausibly claim he should not have known about the FBAR filing requirement."); *see also Rum*, 995 F.3d at 890; *Horowitz*, 978 F.3d at 90; *Williams*, 489 Fed.Appx. at 659; *Kimble*, 991 F.3d at 1243; *Norman*, 942 F.3d at 1116; *Gentges*, 531 F. Supp. 3d at 744-50; *Landa*, 153 Fed. Cl. at 597-99; *Goldsmith*, 541 F. Supp. 3d at 1094-97; *McBride*, 908 F. Supp. 2d at 1198; *Bohanec*, 263 F. Supp. 3d at 886.

- Vettel did not timely file an FBAR disclosing the BSI Account for tax years 2006 through 2011. (SF ¶ 98.)

- Vettel knew that he failed to report the more than $1.6 million he earned and deposited in the BSI Account, including income from interest and capital gains earned on the funds in the BSI Account, on his Form 1040 tax returns for years 2006 through 2011. (SF ¶¶ 67, 81, 109-111, 119; TT at 35:14-22, 46:9-47:24, 139:16-18, 141:10-12.) Simultaneously, he reported on those tax returns the interest income he earned from his domestic bank accounts. (SF ¶¶ 65-67, 119; TT at 46:23-47:24; Exs. 1-4, 6, and 8 at Schedule B.) *Horowitz*, 978 F.3d at 89; *Goldsmith*, 541 F. Supp. 3d at 1101-1104.

- After leaving GSI and closing the BSI Account and transferring the money from that account to Turkey, Vettel earned income from Ukraine through a consultancy agreement with Grain Systems Ukraine, which wired his pay to the U.S. (TT at 9:16-19, 48:23-49:7, 49:15-22.) Vettel told his CPA about this income because he knew "it was subject to taxes." (TT at 48:23-49:7, 49:15-50:8, 50:14-16.) According to Vettel, the difference between the income deposited in the BSI Account and the consultancy-related income is

17

that the consultancy-related income was transferred to the U.S., not to Switzerland. (TT at 50:9-13.)  Vettel admits that it is "not logical" to believe that foreign income he earned is not taxable anywhere. (TT at 142:10-20.)

- Vettel's disclosure of foreign income to his CPA prompted Phelps to ask more questions when preparing his 2012 (and subsequent) tax returns. (TT at 50:17-21.)  Vettel then informed Phelps about a bank account he opened in Turkey, and Phelps prepared an FBAR dated June 25, 2013 to disclose that foreign account. (SF ¶¶ 55, 99-100; TT at 50:22-51:2.)

- Vettel filled in some of the information on the FBAR disclosing the Turkey account. But Vettel claims he did not read the form, and he did not then disclose the BSI Account to Phelps (although by June 2013 the BSI Account was closed, he still did not disclose it or question Phelps about it or any FBAR requirement). (TT at 51:7-52:1, 52:12-14, 52:19-53:16, Ex. 9 at PE-232.)

- For most years that the BSI Account was open, the amount of foreign income that Vettel maintained in the BSI Account was substantial in comparison to the amount of income that the Vettels earned domestically and reported on their federal income tax returns. (SF ¶¶ 56, 119; TT at 64:4-22, 65:6-24, 139:16-18; Ex. 1 at 9 Line 22; Ex. 3 at 4 Line 22; Ex. 4 at 10 Line 22; Ex. 6 at 1 Line 22; Ex. 8 at 1 Line 22.) *See Horowitz*, 978 F.3d at 90 ("it bears noting that the Swiss bank accounts were by no means small or insignificant and thus susceptible to being overlooked").  When Vettel previously received $3 million through the sale of shares in GSI, he made large expenditures, including real property, using that money.  But the $1.6 million in the BSI Account remained in Europe and was not used to make any purchases in the U.S. (TT at 64:4-22, 65:6-24.)

- In 2014, BSI notified Vettel that his account information may be disclosed to the United States. Only then did Vettel inform his CPA about the BSI Account and foreign income and take steps to disclose the account and the foreign income. (SF ¶¶ 76-78, 87-90, 94, 98, 101-105, 107, 109-111; TT at 55:10-15, 55:21-24, 66:11-23, 67:4-9; Ex. 25.)

18

- Vettel failed to make a simple inquiry to his experienced CPA concerning his BSA Account, including any tax consequences therefrom.  (SF ¶¶ 56-58, 79-85, 91, 95, 103-105; TT at 35:14-17.) *See Horowitz*, 978 F.3d at 89-90; *Kimble*, 991 F.3d at 1243; *Kelly*, 92 F.4th at 604; *Gentges*, 531 F. Supp. 3d at 750-51; *Landa*, 153 Fed. Cl. at 597-99; *Goldsmith*, 541 F. Supp. 3d at 1092-94, 1104-06; *DeMauro*, 483 F. Supp. 3d at 85-86; *Ott*, 441 F. Supp. 3d at 530-31; *McBride*, 908 F. Supp. 2d at 1199; *Bohanec*, 263 F. Supp. 3d at 890;  *United States v. Mahyari*, 2023 WL 372656, at * 8 (D. Or. Jan. 24, 2023). According to Vettel: "I didn't bring it to the preparer's attention, it's all on me." (SF ¶ 106.)

- Vettel "never worked with [BSI bank] on any taxation needs" related to his income tax returns or any IRS forms, cannot recall any tax-related conversation with (or advice given by) BSI bank, and does not know if the bank representative he worked with had any knowledge of U.S. tax laws (Vettel "didn't think about it"). (SF ¶ 21-24, 29, 51-54, 96; TT at 24:1-11, 34:4-18, 120:22-121:1.)  Vettel did not disclose the existence of the BSI Account to anyone, much less seek professional advice at any relevant time. (SF ¶ 107.) *See Gentges*, 531 F. Supp. 3d at 750; *Ott*, 441 F. Supp. 3d at 530; *Horowitz*, 361 F. Supp. 3d at 529; *Bohanec*, 263 F. Supp. 3d at 890; *McBride*, 908 F. Supp. 2d at 1212.

- Vettel did not discuss with anyone at BSI whether the funds in his account may be subject to tax in the U.S., Switzerland, or Belize. (TT at 24:1-11.)

- Nobody at BSI ever directed Vettel 1) not to disclose the existence of the BSI Account to the U.S. government or 2) not to pay U.S. income taxes on the funds deposited in the BSI Account. (TT at 24:12-17.)

- Vettel did not advise his CPA about the existence of the BSI Account from 2006 through 2011. (SF ¶¶ 76-78, 92, 103-105, 107; TT at 55:10-15.)  *See Gentges*, 531 F. Supp. 3d at 750; *Bohanec*, 263 F. Supp. 3d at 890; *McBride*, 908 F. Supp. 2d at 1199. The "organizer" that Vettel's CPA provided him asked Vettel about his income, expenses, and other tax-related matters, including about foreign accounts and foreign income, but Vettel claims that he never responded to the questions, did not feel like he needed to answer the

questions in the organizer, and only compiled documents. (SF ¶¶ 68-70; TT at 43:12-44:1; Ex. 5 at PE-0168.) *See Goldsmith*, 541 F. Supp. 3d at 1092 ("Even though Mr. Goldsmith used Mr. Zipser to prepare his tax returns for the entirety of the time he owned the Account, he never disclosed the existence of the Account to Mr. Zipser until July 1, 2011 despite the fact that each year, Mr. Zipser sent Mr. Goldsmith an annual questionnaire asking about foreign income. [] In fact, this questionnaire included multiple questions about foreign accounts that would have encompassed the Account."); *Reyes*, 2024 WL 437096, at *2 ("[The accountant's] routine practice during the years he worked for Defendants was to send what he referred to as a 'client organizer' to his clients every year to assist him in preparing their federal income tax returns. [] In the client organizer, [the accountant] asked his clients, among other questions, if they had any foreign income. [] Defendants never returned the client organizer, but instead provided 1099 forms."). Vettel did not provide his CPA with any documents related to his BSI Account or any foreign income from 2006 through 2011. (SF ¶¶ 61-67, 78, 87-90.)

- As Vettel admits regarding the organizer, "you look at that now and you see oh, my gosh, there was a lot of things that should have been alerting me." (TT at 44:9-11.)

- Vettel did not tell his CPA/tax return preparer about the foreign income that he earned from 2006 through 2011 and deposited in his BSI Account, or the interest income generated by the funds in his BSI Account. (SF ¶¶ 76, 91, 87-90, 110-111; TT at 46:9-22.) *See Kelly*, 92 F.4th at 604 ("Kelly's conduct was objectively reckless. He opened a Swiss bank account, into which he immediately deposited over $1.8 million. He did not, however, seek professional advice about his reporting obligations or the potential tax implications of those assets. Kelly also did not confirm with Finter whether it would report his assets to U.S. authorities."); *McBride*, 908 F. Supp. 2d at 1199; *Landa,* 153 Fed. Cl. at 597; *Goldsmith*, 541 F. Supp. 3d at 1101 ("The record in this case shows that it is undisputed that Mr. Goldsmith knew (1) he had tax obligations as a U.S. citizen as evidenced by the fact that he hired Mr. Zipser in the first place; (2) he had to pay taxes on domestic income as evidenced by his work with Mr. Zipser and filing of tax returns; and (3) the Swiss Account generated income.").

- Vettel, who communicated with Phelps when she prepared the Vettels' tax returns, admits that he had ample time to review his 2006 through 2011 tax returns and ask Phelps any questions that he may have had before they were filed. (SF ¶¶ 72-75; TT at 40:3-20, 44:16-45:11.)  *See Kimble*, 141 Fed. Cl. at 385–86; *Gentges*, 531 F. Supp. 3d at 745–46 ("most courts have held that where, as here, a defendant provides false information regarding foreign bank accounts by failing to review carefully his income tax return, that defendant has shown reckless disregard toward, and thus has willfully violated, the FBAR reporting obligation"); *Reyes*, 2024 WL 437096, at *6.  Phelps had an "open door" and Vettel could contact her any time. (TT at 44:25-45:7.)  Vettel's concern was whether he owed money or was getting a refund. (TT at 45:12-18.)

- Vettel knows that it is his responsibility to review and check his tax returns for accuracy. (TT at 45:19-22.)  *See Goldsmith*, 541 F. Supp. 3d at 1095 ("Indeed, 'a taxpayer signing their returns cannot escape the requirements of the law by failing to review their tax returns.'") (quoting *Kimble*, 991 F.3d at 1242-43 and citing *Price v. Comm'r*, 887 F.2d 959, 965 (9th Cir. 1989); *Greer*, 595 F.3d at 347 n.4; *Doherty*, 233 F.3d at 1282 n.10; and *Park v. Comm'r,* 25 F.3d 1289, 1299 (5th Cir. 1994)).  Before Phelps began preparing Vettel's tax returns, Vettel prepared his tax return himself, and reviewed it for accuracy. (TT at 38:19-39:7.)

- Vettel ignored the notice his CPA's engagement letter provided advising him "to review the returns prior to signing, as you have final responsibility for all information included in the returns" and to ask any questions "[i]f there is anything on the return you do not understand." (SF ¶ 72.) *Landa*, 153 Fed. Cl. at 598 ("he had the assistance of a tax preparer in preparing his 2009 tax return and could have sought counsel on his FBAR-reporting requirement had he disclosed the account".) *Reyes*, 2024 WL 437096, at *7 ("Defendants' undisputed failure to review their incorrect tax returns in advance of the filing of the returns, as well as the additional undisputed evidence, demonstrate that they acted, at a minimum, recklessly when they failed to file FBARs").

- Vettel signed his 2006 through 2011 tax returns under the penalty of perjury, affirmed that the contents were true and correct, and authorized his CPA to electronically file

them. (SF ¶¶ 74, 93-94; Exs. 1-4, 6, 8.) This "in and of itself supports a finding of 'reckless disregard' to report under the FBAR." *Rum*, 2019 WL 3943250 at \*8. *See Kimble*, 141 Fed. Cl. at 385–86; *Williams*, 489 F. App'x at 659; *Landa*, 153 Fed. Cl. at 598; *Norman*, 942 F.3d at 1116 ("Norman signed her 2007 tax return under penalty of perjury, and this return falsely indicated that she had no interest in any foreign bank account. She did so after her accountant sent her a questionnaire that specifically asked whether she had a foreign bank account."). *See also Collins*, 36 F.4th at 492-93.

- Vettel never questioned his CPA about the possible U.S. tax consequences related to his foreign income deposited in, and generated by, the BSI Account. (SF ¶¶ 72, 75-77, 80, 84, 90-91, 105-107; TT at 48:7-12.) *See Gentges*, 531 F. Supp. 3d at 750 *Landa*, 153 Fed. Cl. at 598. *See also Kelly*, 92 F.4th at 604 (Kelly "never consulted a tax advisor or an attorney. Given that he ought to have known about the risk of noncompliance, and could have found out by simply asking, his failure to disclose was, at the very least, reckless.").

- Vettel provided his CPA with "everything" necessary to prepare his tax returns, but only with respect to his domestic income; Vettel did not provide <u>any</u> information or documentation related to the BSI Account and the funds in that account. (SF ¶¶ 61-71, 76-78, 87-90.) *See Horowitz*, 978 F.3d at 89–90.

As shown above, there is <u>substantial</u> and overwhelming evidence (and certainly more than a preponderance of the evidence) that Vettel's failure to file the FBAR was willful. *See, e.g., Landa v. United States*, 153 Fed. Cl. 585, 597–98 (2021) (finding willfulness where the defendant: 1) "opened the BSI account as a numbered account"; 2) "failed to disclose this foreign account to his accountant and never asked his accountant how to report the income from the foreign account"; 3) "did not report income earned from the BSI account" on his "original Form 1040 federal income tax return for the 2009 tax year"; 4) "indicated on Schedule B of his 2009 Form 1040 that he did not have any interest or signature or other authority over an overseas

account"; 5) "directed BSI not to invest in U.S. securities"; and 6) "directed BSI to retain correspondence at the bank.") (citing *Norman*, 942 F.3d 1111, and *Kimble*, 991 F.3d 1238, for finding willfulness based on similar facts); *Williams*, 489 Fed. Appx. at 659 (holding that the taxpayer's conduct constitutes willful blindness to the FBAR requirement because: (1) the taxpayer signed his 2000 return under penalties of perjury, which constituted "prima facie evidence that he knew the contents of the return"; (2) Line 7a's directions on the Schedule B to "[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1" put the taxpayer on inquiry notice of the FBAR requirement; (3) the taxpayer did not consult Form TD F 90-22.1 or its instructions; (4) the taxpayer did not disclose his foreign account in response to questions in an organizer provided by his accountant; and (5) the taxpayer falsely reported that he had no foreign accounts on the Schedule B attached to his 2000 return); *Goldsmith*, 541 F. Supp. 3d at 1092-1106 (finding willfulness where the defendant: 1) failed to disclose the foreign account to his tax return preparer despite receiving an annual questionnaire from the preparer asking about foreign income and accounts; 2) signed his tax returns indicating on Schedule B that he did not hold a foreign account; 3) declined to have the foreign account invest in U.S. securities; 4) failed to disclose the income generated by the foreign account's investments; 5) set up his foreign account as a numbered account; and 6) paid to have his mail held at the bank.)

The Court, in its order denying in part the government's motion for summary judgment, questioned whether Vettel was simply confused about his legal obligations based on "BSI's misinformation." (ECF No. 32 at 6-7.)  But at trial it was patently obvious that Vettel was not confused: there was no evidence showing any statements that BSI may have made concerning Vettel's U.S. tax and reporting obligations. Vettel could not recall any specific statement that anyone at BSI bank made to him about his U.S. tax and reporting obligations, or any specific

meeting where they discussed U.S. tax and reporting obligations. Vettel did not discuss with anyone at BSI whether the funds deposited in the BSI Account may be subject to tax in the U.S., Switzerland, or Belize. Nobody at BSI ever directed Vettel not to disclose the existence of the BSI Account to the U.S. government. Nobody at BSI ever directed Vettel not to pay U.S. income taxes on the funds deposited in the BSI Account. (TT at 24:1-17.)

As Vettel explained, in his mind, he believed the income was generated in Europe and stayed there.  But as discussed earlier, his subjective beliefs are neither controlling nor a defense. Under the objective test for willfulness as discussed above, his conduct was at least reckless if not deliberately willful. The evidence showed that Vettel willfully chose <u>not</u> to investigate his duty to report in the United States: 1) that income and 2) anything related to that income, including the BSI Account where it was maintained. Vettel never planned to disclose or pay U.S. income tax on the funds in the BSI Account and did not ask anyone in the U.S. any questions about his potential liabilities because he did not want to hear a contrary requirement. Vettel differentiated the tax consequences of the foreign income held in Europe in the BSI Account from 1) funds wired directly from Ukraine to Vettel in the United States, which he disclosed to his CPA because he knew "it was subject to taxes" because it was sent to the U.S. rather than Switzerland, and 2) his U.S.-based "Raymond James dividend that had to be submitted for taxation purposes in the U.S." (SF ¶ 67; TT at 48:3-6, 48:23-49:7, 49:15-50:16.)  Under Vettel's flawed reasoning, by keeping the money generated from his work in Ukraine outside of the United States and keeping its existence a secret, Vettel could avoid reporting and paying U.S. taxes.  But this is obviously contrary to law: "A fundamental principle of U.S. tax law is that U.S. citizens are subject to Federal income tax on their worldwide income." *Cole v. Comm'r of Internal Revenue*, 2016 WL 2928576, at *2 (T.C. 2016) (citing *Cook v. Tait*, 265 U.S. 47, 56

24

(1924); *Huff v. Commissioner*, 135 T.C. 222, 230 (2010)). *See Rogers,* 783 F.3d at 333. And Vettel's "subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, [Vettel] could easily have determined whether his belief was accurate by speaking with a longtime tax preparer." *Gentges*, 531 F. Supp.3d at 750. *See Reyes*, 2024 WL 437096, at *2 (finding willfulness where defendants did not complete accountant-provided organizer that asked questions about foreign income and did not disclose foreign income or account to accountant because defendants claimed it "was 'not income in the United States' and Defendants 'didn't feel the obligation that we have to this country with this account.'")

Vettel had ample time to review his 2006 through 2011 federal tax returns, including the Schedule B where he answered "no" to whether he held a foreign account, and he signed those returns under penalty of perjury. (SF ¶ 75.) Vettel's failure to truthfully answer this simple question shows that he acted willfully. "In fact, the majority of courts have found falsely answering question 7(a) on Part B of Form 1040 under penalty of perjury to be prima facie evidence of willfulness." *Goldsmith*, 541 F. Supp. 3d at 1095. *See Rum*, 2019 WL 3943250, at *8 (finding that a "taxpayer's failure to review their tax returns for accuracy despite repeatedly signing them, along with 'falsely representing under penalty of perjury' that they do not have a foreign bank account (by answering 'no' to question 7(a) on Line 7a of Schedule B of a 1040 tax return) *in and of itself* supports a finding of "reckless disregard" to report under the FBAR." (citing *Kimble*, 141 Fed. Cl. at 376)).  "Once a taxpayer signs a tax return, they are 'put on inquiry notice of the FBAR requirement' and, as such, 'charged with constructive knowledge' of the contents of the tax return in question." *Rum*, 2019 WL 3943250, at *8 (quoting *Kimble*, 141 Fed. Cl. at 385-86 and citing *Williams*, 489 F. App'x at 659). Line 7a on the Form Schedule B explicitly asks a simple and straightforward question: "At any time during [the tax year], did you

25

have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" *See Flume*, 390 F. Supp. 3d at 857. Vettel had the opportunity to question Phelps about his tax returns. (SF ¶¶ 72-75.) But instead of asking questions, Vettel failed to disclose his BSI Account to Phelps, just as he failed to disclose his foreign-originated income. (SF ¶¶ 28, 48, 52, 90.) Had Vettel taken just minimal steps to investigate his FBAR reporting obligations, or even disclosed his BSI Account to his preparer (as he did when he subsequently held a foreign account in Turkey, resulting in the filing of an FBAR) he would have known that he was obligated to file FBARs for 2006 through 2011 disclosing the BSI Account. Vettel's failure to conduct an adequate investigation suggests "a conscious effort to avoid learning about [his FBAR] reporting requirements" or, at the very least, "reckless conduct in disregard of potential reporting requirements." *Gentges*, 531 F. Supp. 3d at 751; *Landa*, 153 Fed. Cl. at 598–99. Vettel was positioned to easily figure out what filing obligations he had with respect to his BSI Account, but he consciously chose not to do so.

Tellingly, Vettel compiled voluminous documents to provide to Phelps to prepare his tax returns. Vettel describes it as: "Everything. Everything that would come in the mail I would have accumulated." (SF ¶ 64.)  This included Forms W-2, 1099 for Vettel's home mortgage, 1099-T showing education expenses for Vettel's son, documents showing charitable contributions made, Forms K-1, and Raymond James investment statements. (SF ¶¶ 65, 71; TT at 40:21-41:9, 48:3-6.) In short, Vettel provided his preparer with everything *but* any records related to the BSI Account. Vettel, and GSI, had records showing the amount that Vettel earned through Grain Systems Ukraine, and BSI held Vettel's bank statements, but Vettel did not provide these to Phelps. (TT at 41:10-42:4.)  As shown by Vettel's failure to disclose the BSI Account to *anyone*, not producing these records to Phelps was no mere oversight.

26

### 1. Vettel Concealed the BSI Account from his CPA and other Financial Advisors

There were many people who Vettel chose not to disclose the BSI Account to, in addition to his CPA, who may have alerted Vettel to the foreign account disclosure requirement:

- Todd Sheets (his advisor at Raymond James) and Zach Burke, who oversaw Vettel's U.S.-based investment accounts when he opened and held the BSI Account, and who were both family friends that Vettel trusted (TT at 56:7-57:16);

- Bruce Schreiner, a CPA and former IRS Revenue Agent who Vettel met around 2009 or 2010 and who Vettel worked with on a U.S.-based investment, and who ultimately assisted Vettel with the IRS examination of his FBAR and tax liabilities (TT at 57:17-23, 58:5-21, 59:21-60:6, 60:25-61:3);

- Chris Stewart, who was a relative through marriage, and who was also a CPA and the person who put Vettel in touch with Schreiner for the U.S.-based investment (TT at 58:11-19, 59:16-20, 61:4-6); and

- Ernst & Young, a Big Four accounting firm, which assisted with the Turkey investment where Vettel transferred the funds that were in the BSI Account (TT at 61:7-18).

Additionally, in 2011, Vettel met with an estate planner. Vettel disclosed his U.S. income, assets, and investments as part of the estate planning that resulted in Vettel's home being placed in a trust held by Vettel's wife. [8] (TT at 61:19-23, 62:2-63:22. Despite having over $1 million in the BSI Account at that time, Vettel did not disclose that information to the estate planner. (TT at

---

[8] Additionally, transferring assets to an insider (a trust in his wife's name) while concealing income and incurring a debt (taxes on over $1.6 million in unreported income) are badges of fraud and indicative of a fraudulent transfer to hinder creditors (here, the IRS). *See, e.g., Colombo Candy & Tobacco Wholesale Co. v. Ameristar Casino Council Bluffs, Inc.*, 972 F. Supp. 2d 1103, 1109 (D. Neb. 2013). This further supports a finding that Vettel intended to conceal the BSI Account and acted willfully in failing to file FBARs.

63:23-64:3.)  While Vettel agrees that it is important to disclose all assets to an estate planner, Vettel claims he did not because that money was destined for Turkey. (TT at 63:14-22.)

Vettel's inactions, including failing to question the foregoing individuals and entities about his duties with respect to the BSI Account, demonstrate an intent to conceal the account. Certainly, Vettel's CPA knew of the FBAR filing requirement, yet Vettel never mentioned the BSI account to her before 2014. *See Horowitz*, 978 F.3d at 90 ("Despite numerous red flags, they neither made a simple inquiry to their accountant nor gave even the minimal effort necessary to render meaningful their sworn declaration that their tax returns were accurate."). Considering that Phelps knew of the FBAR requirement and prepared an FBAR disclosing Vettel's account in Turkey when she learned of that account, Phelps undoubtedly would have prepared an FBAR for the BSI Account had Vettel disclosed it (as she did after learning of it in 2014). A simple question to his CPA – or any of his other U.S.-based financial advisors, business partners, or family with some accounting or tax background – would have revealed, or at least directed Vettel to discover, Vettel's foreign tax and reporting requirements. Vettel chose not to learn of his legal obligations.  Rather, he hoped that he could just leave in Europe the money he earned from his business in Ukraine, with no one in the United States knowing of its existence.

Willful blindness "may be inferred where 'a defendant was subjectively aware of a high probability of the existence of a tax liability and purposefully avoided learning the facts pointing to such liability.'" *United States v. Schwarzbaum*, 611 F. Supp. 3d 1356, 1367–68 (S.D. Fla. 2020) (quoting *Williams*, 489 F. App'x at 658; *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011)).  As Vettel told Revenue Agent Urtecho, it was not logical that his income from Ukraine would not be taxed anywhere. (TT at 142:10-20.)  But he did not even take rudimentary action to learn of his reporting obligations relating to that income and the BSI Account, when

28

those who knew the answers – or could easily direct Vettel to the answers – were all around. Vettel avoided asking any questions which undoubtedly would have revealed his reporting requirements. *See United States v. Horowitz*, 361 F. Supp. 3d 511, 529 (D. Md. 2019), *aff'd*, 978 F.3d 80 (4th Cir. 2020) (finding that "willful blindness may be inferred" where taxpayers failed to discuss their tax liabilities for their foreign accounts "with the accountants they entrusted with their taxes for years").  Vettel vaguely alludes to unidentified conversations with BSI employees that may have given the impression that he did not have to worry about income taxes.  But like in *Horowitz*, any possible discussions about taxes with BSI employees demonstrates Vettel's "awareness that the income could be taxable" and his "failure to have the same conversation with the accountant[] [he] entrusted with [the Vettels'] taxes for years… shows 'a conscious effort to avoid learning about reporting requirements.'" *Id*.  More importantly, even if substantive evidence existed that Vettel discussed his U.S. tax liabilities or bank account reporting requirements with someone at BSI (and there is no such evidence), Vettel's subjective belief of his U.S. reporting requirements "'does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer.'" *Reyes*, 2024 WL 437096, at *7 (quoting *Gentges*, 531 F. Supp. 3d at 750 and citing *Horowitz*, 978 F.3d at 89).

## 2.   Vettel Concealed the Account from his Family

Vettel did not disclose the BSI Account to his wife. At all relevant times, Vettel and his wife held joint U.S. bank accounts. Vettel and his wife each reviewed account statements when they came in the mail so they would be "in sync with what's going on," and Vettel balanced the checkbook and assembled records for tax time. (TT at 26:15-27:6.)  Vettel's wife also knew about his salary, any bonus he received at work, his retirement account, and his U.S. investment

accounts, if only so she would "know generally how's it going." (TT at 27:7-28:1.)  Previously, when Vettel came into substantial funds, he also shared those with his wife. (TT at 64:4-24, 65:6-24.)  But Vettel did not tell his wife about the BSI Account or the funds in that account and paid BSI to hold mail at the bank.[9]  Vettel's wife did not learn of the account until 2014 when a letter arrived in the mail from BSI, eight years after Vettel opened the account (and well after it closed in 2011). (TT at 28:2-10, 65:22-24; Ex. 25.)

Moreover, Vettel's wife has worked in various positions at banks in the United States off and on since 1978. (TT at 25:14-25, 26:5-10, 25:14-25, 68:21-69:15.)  Even if Vettel's wife did not have specific knowledge of foreign bank accounts, had Vettel mentioned to her that he established a foreign account and signed documents (some which may have been blank) that identified himself as the shareholder and director of a Belize corporation, his wife could have offered her knowledge or inquired at her job whether this was a normal practice. Signing documents for his BSI Account to be held in the name of a Belize corporation that he purportedly owned was another red flag that Vettel ignored.

The BSI Account also did not have any beneficiary or survivorship rights. If something happened to Vettel, not only did his wife not know about the account, but BSI had no identified duty to give Vettel's wife access to the account or the funds in the account. (TT at 26:5-10, 28:15-29:3.) The only other person who knew of the BSI Account, Vettel's business partner Moualla, also had no access to the account. (TT at 25:9-13, 29:20-21, 30:3-6.)  Only Vettel had access, even though over $1.6 million was deposited in the account. (TT at 30:7-16, 30:23-31:5.)

Vettel planned to work with his son on the investment in Turkey using the BSI Account

---

[9] Although Vettel stayed on top of his domestic accounts and account statements, Vettel could only learn of the BSI Account's balance and investment performance by visiting Switzerland.

funds. Vettel created a U.S.-based LLC, VIG LLC, a name that Vettel's son coined (Vettel Investment Group). Yet Vettel never mentioned the BSI Account to his son or told him where the funds for the investment came from. (TT at 37:11-38:7, 38:13-15.)

### 3.   Vettel is Responsible for Not Disclosing the BSI Account

Vettel admits that no one at BSI directed him not to disclose the account or report the foreign income in the U.S., and he cannot identify any specific meeting where any taxation of the funds in the BSI Account was discussed with anyone at BSI. And, if Vettel honestly believed (or at least questioned) whether he must report his foreign income on his U.S. tax returns, there is no harm in asking his CPA (or other financial advisor, business associate, or estate planner in the U.S.) a simple question to confirm this belief.  But Vettel repeatedly avoided investigating or learning of the FBAR requirement. Instead, he concealed his foreign account (and income) from everyone in the United States. Rather than hear something that he did not want to hear – that he must pay taxes on income earned from his work in Ukraine – he stuck his head in the sand and did not question *anyone*.

Moreover, Vettel's claim that the funds in the BSI Account were not taxable in the U.S. because they were generated in Europe and stayed in Europe is based on the false premise that the commission payment originated in Ukraine. When GSI products were sold in Ukraine, the proceeds went to GSI in the United States. GSI then paid a commission to Vettel's business, Grain Systems Ukraine. Grain Systems Ukraine then transferred Vettel's share of that commission to the BSI Account. Thus, the funds comprising that commission for sales in Ukraine came from GSI in the United States. (TT 12:22-25, 123:6-11, 124:10-21.)

Vettel attempts to blame BSI by pointing to the terms in the non-prosecution agreement. But even assuming, *arguendo*, that BSI "assisted or advised" Vettel in avoiding his federal

31

income tax liabilities and reporting his foreign bank account (and there is no evidence in the record of this), that would not absolve Vettel of his reporting duties. Vettel is still responsible for the information reported on *his* tax returns even if someone else assisted or advised him or prepared those returns. *See United States v. Powell,* 2024 WL 1342678, at *8 (E.D. Mich. 2024) ("taxpayers remain responsible for any of their own wrongdoings, and hundreds of [the tax return preparer]'s customers have already been audited. [] Holding [the tax return preparer] responsible does not let taxpayers off the hook."); *United States v. Stover*, 731 F. Supp. 2d 887, 914 (W.D. Mo. 2010), *aff'd*, 650 F.3d 1099 (8th Cir. 2011) (noting, in a lawsuit against a tax shelter promoter, how customers of that promoter were still liable for unreported tax and penalties). *See also United States v. Pugh*, 717 F. Supp. 2d 271, 302 (E.D.N.Y. 2010) (noting, in lawsuit to enjoin fraudulent income tax preparers, the harm caused to customers "who relied upon defendants' advice, had improper tax returns prepared in their name, did not pay their proper federal income taxes, and were liable for underpaid taxes, penalties, and interest"); *United States v. Stinson*, 239 F. Supp. 3d 1299, 1326 (M.D. Fla. 2017) (same); *In re Crawley*, 244 B.R. 121, 130 (Bankr. N.D. Ill. 2000) (finding, where the debtors claimed that they did not review their tax returns prepared by their accountant, "that even if the Crawleys relied on a belief that [their accountant] advised them not to file tax returns, they had a known duty to file the tax returns and pay the taxes due").  And, to the extent that Vettel had a "relationship manager" at BSI (as referenced in the non-prosecution agreement and as Vettel theorized in his trial testimony), that "does not excuse his noncompliance." *Kelly*, 92 F.4th at 605 (discussing how the taxpayer engaged "a Swiss account manager" but still "undertook considerable efforts to keep [the account] secret" and "did not consult with any professionals about his tax obligations").

        In any event, to the extent that Vettel claims he did not know or believe he needed to

report and pay U.S. taxes on the income that he earned outside of the United States and deposited in the BSI Account (even though he admits that it does not make sense that taxes would not be paid somewhere), his belief is legally irrelevant as explained above. This also ignores the fact that Vettel still failed to disclose the existence of the BSI Account, a separate violation of U.S. law from failing to report and pay taxes on income. The question asked on the tax return is whether the taxpayer has a foreign bank account having a balance of $10,000 or more; it is "irrelevant whether [a taxpayer] actually believed that his income was not taxable—the question simply asked if such account *existed*." *Rum*, 2019 WL 3943250, at *8 (emphasis included). Vettel knew that his BSI Account existed and failed to disclose it.

By any objective standard, Vettel acted recklessly. *See Kelly*, 92 F.4th 598, 604 (6th Cir. 2024) (finding "objectively reckless" conduct where: "Kelly designated his Finter account as "numbered" so that his name would not appear on the statements, and he requested that the bank retain any account-related correspondence. These efforts, which allowed him to shield his considerable assets from U.S. authorities, 'evince[ ] more than mere negligence.' Kelly also shielded his account from U.S. authorities by opting out of investing in U.S. securities, which would have required him to file a Form W-9 with the IRS. Only after Finter told Kelly that it would disclose his account to U.S. authorities did Kelly take steps to comply with his reporting obligations by requesting to participate in the OVDP.") (internal citation omitted); *Horowitz*, 978 F.3d at 89-90 (finding "objectively reckless" conduct where taxpayers: held a "significant portion of their savings" in a foreign bank account and "earned interest income on that account"; knew they had to pay tax on the salary income earned abroad; "recognized that interest income was taxable income under American law, at least when earned in a domestic bank account"; did not disclose the foreign income or foreign bank account to their accountant; travelled to

Switzerland to check on the account performance; and checked "no" on the box the Schedule B

on their tax returns asking if they held a foreign account.).

There is ample evidence adduced at trial that establishes willfulness. *See McBride,* 908 F.

Supp. at 1205; *Landa*, 153 Fed. Cl. at 597–98; *Norman*, 942 F.3d at 1115; *Williams*, 489 Fed.

Appx. at 659; *Goldsmith*, 541 F. Supp. 3d at 1092-1106 ("The Court finds that the first four facts

demonstrate willfulness by evidencing that Mr. Goldsmith was charged with constructive

knowledge of his FBAR-reporting obligations and reckless disregard thereof, while the fifth fact

shows willful blindness."). For example, "the failure to learn of the filing requirements coupled

with other factors, such as efforts taken to conceal the existence of the accounts and the amounts

involved, may lead to a conclusion that the taxpayer acted willfully." *Rum*, 995 F.3d at 890

(citing *Norman*, 942 F.3d at 1115). Additionally, Vettel's BSI Account was "by no means small

or insignificant and thus susceptible [of] being overlooked by [him]." *See Gentges*, 531 F. Supp.

3d at 751 (quoting *Horowitz*, 978 F.3d at 90).  Given the sizeable balances of Vettel's undeclared

foreign account, and that the funds deposited in that account were generated by Vettel's

international business activities, it is not reasonable for the holder of such an account not to

investigate or otherwise inquire about the reporting obligations on that income.  Vettel

consciously avoided learning about, to investigating, or inquiring about his FBAR reporting

obligations. *See Kelly*, 92 F.4th at 600 ("Kelly's actions, or lack thereof, after he opened the

account are important. He never sought professional or legal advice about 'federal reporting

obligations or requirements in regard to the Finter [foreign bank] account' or 'potential tax

implications,' and he never confirmed with Finter whether it was reporting his account to the

federal government.").  He did not consult any qualified tax professionals to determine his FBAR

or income reporting obligations.  *See, e.g., Horowitz*, 978 F.3d at 89-90; *Kimble*, 991 F.3d at

1243; *Landa*, 153 Fed. Cl. at 597-99; *Gentges*, 531 F. Supp. 3d at 750-51.

The facts above – which are substantially similar to the many cases cited herein where a court found the party to have acted willfully – unquestionably demonstrate that Vettel acted willfully, and at a bare minimum recklessly or with willful blindness, in not reporting the BSI Account he held from 2006 through 2011. [10]

## CONCLUSION

David Vettel acted, at a <u>minimum</u>, with reckless disregard or willful blindness of his legal obligation to report to the Secretary of the Treasury his BSI Account from 2006 through 2011. The Court should enter judgment in favor of the United States and against David Vettel for the FBARs assessed against him for the years 2006, 2007, 2008, 2009, 2010, and 2011 in the amount of $737,314.30 (the total owed as of September 1, 2023), plus interest accruing from September 1, 2023.

## LOCAL RULE 7.1(d) CERTIFICATION

Pursuant to Local Rule 7.1(d), I certify that the United States' Post-Trial Brief complies with the word limits of Local Rule 7.1(d)(1)(A). I further certify that, in preparation of this memorandum, I used Microsoft Word, and that this word processing program has been applied

---

[10] We also note that Vettel closed the BSI Account in 2011 because, he claims, it was time to invest those funds in Turkey. But the timing of the account closing coincides with BSI's closure of unreported accounts held by U.S. citizens, as outlined in the non-prosecution agreement between the United States and BSI that Vettel references. That agreement states that in January 2011, "BSI adopted a policy requiring the closure of existing U.S. client accounts that failed to provide a Form W-9 or evidence of participation in an IRS Offshore Voluntary Disclosure Program by the end of 2012." (Ex. 103, p. 8.) Vettel did not provide a Form W-9 and did not participate in a disclosure program at any time while the BSI Account was open. He also maintained the account in the name of Wanstead International and never put the account in his own name. (TT 121:17-122:6.) This calls into question the reason for closing the BSI Account, particularly where Vettel did not close its existence until 2014 when BSI informed him it may provide his information to "the U.S. authorities." (TT 53:17-55:15; Ex. 25.)

specifically to include all text, including the caption, headings, footnotes, quotations, and citations (including the "SF" abbreviations) in the following word count.

I further certify that the above referenced memorandum contains 12,317 words.

Dated: April 2, 2024                         Respectfully submitted,

                                             SUSAN T. LEHR
                                             United States Attorney
                                             DAVID A. HUBBERT
                                             Deputy Assistant Attorney General

                                             s/ Daniel A. Applegate
                                             DANIEL A. APPLEGATE
                                             U.S. Department of Justice, Tax Division
                                             P. O. Box 7238, Ben Franklin Station
                                             Washington, D.C. 20044
                                             Telephone: (202) 353-8180
                                             Fax: (202) 514-6770
                                             daniel.a.applegate@usdoj.gov